**UNITED STATES of America,**

v.

**Noble L. MORTON, Defendant**

**No. CRIM.A.PJM 03–0021.**

United States District Court,
D. Maryland.

March 24, 2004.

---

Michael T. Citaramanis, Esq., Office of the Federal Public Defender, Greenbelt, MD, for Plaintiffs.

Odessa P. Jackson, Esq., Office of the U.S. Attorney, Greenbelt, MD, for Defendants.

## OPINION

MESSITTE, District Judge.

### I.

Noble L. Morton has been charged in a two-count indictment with aggravated sexual abuse of a minor in violation of 18 U.S.C. § 2241(c) and abusive sexual contact with a minor in violation of 18 U.S.C. § 2244(a)(1) & (c). The Government alleges that Morton committed these crimes in Landstuhl, Germany while working in a civilian capacity for the U.S. Air Force and while visiting a U.S. Government housing facility located off the premises of Ramstein Air Force Base. Morton has filed a Motion to Dismiss the Indictment, arguing that the Court lacks jurisdiction over the crimes alleged. The Court agrees that it lacks jurisdiction and GRANTS the motion.

### II.

In September 1995, Morton was employed as a civilian computer programmer at the Landstuhl Regional Medical Center, Information Management Division, in Landstuhl, Germany. During his assignment, Morton, who lived elsewhere, frequented a private residence located at the U.S. housing quarters in Landstuhl. The property was owned by a private German citizen who had leased it to the Federal Republic of Germany. As set forth in the lease agreement, the property was obtained for the use of the United States Government for the purpose of providing housing to its military personnel and their

dependents stationed at Ramstein Air Force Base.[1] Under the terms of the lease, the owner of the property maintained control of it, including, inter alia, servicing and maintaining it, approving any modifications, and reserving the right to conduct inspections. Although many residents of the Landstuhl housing facility worked at the Ramstein Air Force base, the facility was not physically located on nor was it immediately adjacent to the Base nor was it policed or maintained by the U.S. military.

Morton returned to the United States in 1996. Some time after, based upon allegations that Morton had sexually assaulted the minor child of a U.S. citizen residing at the Landstuhl facility, the U.S. Department of the Army, Criminal Investigation Division (CID), commenced an investigation. In early 2001, CID contacted Morton, who was by then residing in Maryland, and on May 1, 2001, interviewed him at Fort Meyer, Virginia. At the interview, Morton admitted to certain criminal conduct with a child under 12 years of age during September of 1995, while she was at her residence in Landstuhl and while her mother was in another room. Specifically, he admitted to brushing the child's vaginal lips with his fingers and becoming sexually aroused, but denied digital penetration. On May 3, however, Morton met again with CID agents, and admitted to digitally penetrating the minor child, as well as fondling her breast, both events occurring at her residence at Landstuhl. He also admitted to fondling the child on several other occasions, as well as display-

ing his genitals to her, having her touch his genitalia, and masturbating in front of her, some of these events also occurring at the Landstuhl facility. Written statements summarizing each interview were prepared, which Morton initialed and affirmed under oath as true and accurate.

In January of 2003, a grand jury sitting in Maryland charged Morton with aggravated sexual abuse and abusive sexual contact with a minor under the "special maritime and territorial jurisdiction of the United States." He was arraigned on March 25, 2003, and entered a plea of not guilty to both counts.[2] His Motion to Dismiss Indictment was filed on June 25, 2003 and oral arguments thereon were held on October 9, 2003. As a result of certain questions raised at that time, the hearing was continued to allow the Government to obtain additional documentation from appropriate sources in Germany. That documentation has now been submitted to the Court and Morton's Motion to Dismiss stands ready for decision.

III.

Aggravated sexual abuse and abusive sexual contact are federal offenses punishable, inter alia, under "the special maritime and territorial jurisdiction of the United States." 18 U.S.C.A. § 2241(c) (2003); 18 U.S.C. § 2244(a)(1) & (c) (2003). "Special maritime and territorial jurisdiction[,]" as defined by 18 U.S.C. § 7(3), includes "any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof[.]" (2003).[3] Morton challenges the

---

1. According to the terms of the lease agreement for the facility ("the tenancy property"), "[t]he lessor transfers the use of the tenancy property described in § 1 to the lessee for use by the United States Armed Forces for housing purposes."

2. Morton subsequently filed a Motion to Suppress Statements which was denied.

3. Additional provisions for "special maritime and territorial jurisdiction" included in 18 U.S.C. § 7 cover the high seas, certain vessels, lands acquired by consent of a state legislature, lands containing guano deposits, certain aircraft, space vehicles and places outside the jurisdiction of any state. These locations have no relevance to the present case.

Court's jurisdiction over these statutes on three grounds: first, he says, the United States cannot enforce its laws outside its territory under the doctrine of territorial jurisdiction; second, even if territorial jurisdiction does not apply, Congress did not intend to apply these statutes extraterritorially; and third, the U.S. Government housing quarters in Landstuhl, Germany are not part of the "special maritime and territorial jurisdiction of the United States."

## A.

Generally speaking, every nation has "territorial jurisdiction" over crimes committed within its borders. *See Wilson v. Girard*, 354 U.S. 524, 529–30, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957) ("A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction."); *see also*, 45 Am.Jur.2d, International Law § 62 & 64 (1999). A nation may also proscribe certain conduct beyond its borders, including, inter alia, "the activities, interests, status, or relations of its nationals outside as well as within its territory." Restatement (Third) of Foreign Relations Law of the United States, § 402 et seq. (1987); *see also, EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (*"Aramco "*) ("Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.") (citations omitted). Congress, then, unquestionably has within its powers to criminalize sexual abuse of a minor U.S. citizen by another U.S. Citizen, regardless of where it may occur. *See e.g.,*

*United States v. Erdos,* 474 F.2d 157, 159 (4th Cir.1973). The issue is whether Congress has in fact exercised this power with regard to the criminal statutes involved in the present case, *Aramco,* 499 U.S. at 248, 111 S.Ct. 1227, and whether those statutes provide jurisdiction based upon the facts of the case.

## B.

■ Unless a more expansive intent appears, acts of Congress are presumed to apply only within the territorial limits of the United States. *Sale v. Haitian Ctrs. Council Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) ("Acts of Congress normally do not have extraterritorial application unless such intent is clearly manifested."). A presumption against extraterritorial application "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramco,* 499 U.S. at 248, 111 S.Ct. 1227. To some extent, however, those concerns are not implicated by 18 U.S.C. § 7(3), which extends only to the "special territorial jurisdiction" of the United States.[4] Insofar as that term may be defined to comprehend U.S. territory outside the geographic boundaries of the United States, as to which the exclusive jurisdiction of this country is well-established, e.g. to an American embassy abroad, there is obviously no likelihood of a clash between this country's laws and those of another country. Accordingly, application of the criminal statutes in that circumstance presents little or no problem. The U.S. Court of Appeals for the Fourth Circuit

**4.** Morton argues that defining "territorial jurisdiction" as including foreign lands is "bootstrapping" at its worst. However, the appropriate term to define is not "territorial jurisdiction," but "special territorial jurisdiction," inasmuch as "special" modifies "maritime and territorial." *See Erdos,* 474 F.2d at

160 ("We hold that 18 U.S.C. § 7(3) is a proper grant of *'special' territorial jurisdiction...*") (emphasis added). As the Fourth Circuit found in *Erdos,* lands under "special territorial jurisdiction" are deemed to be within the United States, even though not within its geographic boundaries. *Id.* at 159.

took this view in the *Erdos* case. 474 F.2d at 159.

Erdos, the senior U.S. diplomat or charge d'affairs for Equatorial Guinea, was charged in the District Court for the Eastern District of Virginia with the voluntary manslaughter of another employee occurring within the American embassy in Equatorial Guinea. *Id.* at 158. On appeal from his conviction, Erdos contested the jurisdiction of the district court to try the case, arguing that 18 U.S.C. § 7(3) must be read to apply only within the geographical boundaries of the United States. The Fourth Circuit disagreed. The court considered the nature of embassy property and held it to be within the "special territorial jurisdiction" of the United States.[5] The test that determines whether property lies within U.S. territory, according to *Erdos,* is "one of practical usage and dominion exercised over the embassy or other federal establishment by the United States government." *Id.; see also, United States v. Corey,* 232 F.3d 1166, 1177–78 (9th Cir. 2000) ( "Under [the *Erdos* test], the court considers whether the United States enjoys such control over the area that the law should constructively regard it as United States territory."). Specifically, *Erdos* found two requirements for jurisdiction under 18 U.S.C. § 7(3): first, the lands must be "reserved or acquired for the use of the United States;" and second, they must be "under the exclusive or concurrent jurisdiction thereof."

The Fourth Circuit in *Erdos* did not explicitly address the extraterritorial application of the statute, suggesting that Congress's jurisdiction under § 7(3) could only be applied where "special territorial jurisdiction" obtains.[6] But regardless of whether property is found to be within the "special territorial jurisdiction" of the United States, as the Fourth Circuit in *Erdos* found an American embassy to be, or whether it is found to be within § 7(3) applied extraterritorially, as the Ninth Circuit in *Corey* found a U.S. military base and an off-base facility rented by the U.S. for its personnel to be, the inquiry for determining jurisdiction is the same: Were the lands reserved or acquired for the use of the United States and were they under this country's exclusive or concurrent jurisdiction?

## C.

■ Applying the requirements of 18 U.S.C. § 7(3) in the present case, the Court finds that the U.S. Government housing facility in Landstuhl, Germany qualifies as "land[ ] reserved or acquired for the use of the United States." Although located on private property, the land was leased to the German government for the explicit purpose of providing housing to U.S. military personnel. As discussed in *Erdos,* "fee simple ownership of the property by the United States is not a pre-requisite to such jurisdiction." 474 F.2d at 159. The first jurisdictional prerequisite, therefore, is satisfied.

■ The requirement of dominion, i.e. exclusive or concurrent jurisdiction in the United States, is more problematic and

---

5. According to *Erdos,* "[a] consulate is, ordinarily, a building owned by the Government of the United States. And although it be not owned by the United States, it is a part of the territory of the United States of America." *Id.* at 159 (quoting *United States v. Archer,* 51 F.Supp. 708, 709 (S.D.Cal.1943)).

6. There is a split among the circuits regarding the extraterritorial application of 18 U.S.C. § 7(3). *Compare U.S. v.Corey,* 232 F.3d 1166 (9th Cir.2000) (finding Congressional intent for extraterritorial application in the language of the statute), *with U.S. v. Gatlin,* 216 F.3d 207 (2nd Cir.2000)(finding no such Congressional intent based upon the legislative history of the statute).

ultimately defeats jurisdiction. The Court explains.

In the absence of an agreement granting exclusive or concurrent jurisdiction to a foreign country, Germany retains territorial jurisdiction within its borders. *See Wilson v. Girard, supra.* Accordingly, at first blush the Landstuhl facility remains subject to the exclusive jurisdiction of Germany. And on the record before the Court, there is no evidence that Germany has granted either exclusive or concurrent jurisdiction to the United States over the facility. Indeed, the Government now concedes that there has been no grant or exclusive or concurrent jurisdiction. In a letter submitted to the Court following oral argument, the Assistant United States Attorney states, "After carefully reviewing all of the material and conducting extensive research on these issues, the government has reached the conclusion that the German lease documents, along with numerous additional related materials do not disclose any evidence that there was an intention, by the German authorities, to confer concurrent or exclusive jurisdiction to the U.S. Authorities at the Landsthul [sic] housing facility." The conclusion, therefore, must be that Germany retains exclusive jurisdiction.

During oral argument, however, the Government suggested that the NATO Status of Forces Agreement ("SOFA"), to which both the United States and Germany are signatories, might bear on the matter.[7] Article VII of SOFA addresses the respective jurisdiction of the sending state (here, the United States) and the receiving state (here, Germany). Thus, in relevant part, Section VII of the SOFA states:

Sect. 3—In case where the right to exercise jurisdiction is concurrent the following rules shall apply:

a.) The military authorities of the sending State shall have the primary right to exercise jurisdiction over a member of a force or a civilian component in relation to [ . . . ] offences solely [ . . . ] against the person or property of another member of the force or civilian component of that State or of a dependant.

b.) In the case of any other offense the authorities of the receiving State shall have primary right to exercise jurisdiction.

But the problem with SOFA is that any authority of U.S. military tribunals to try American civilians overseas was foreclosed by the Supreme Court's decision in *Reid v. Covert,* which held that, during times of peace, civilians may not be tried in courts martial. 354 U.S. 1, 35, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).[8] Indeed, the U.S. Army, Navy and Air Force in their own regulations have conceded the Government's lack of jurisdiction over civilians: "For U.S. civilian and dependant personnel, German jurisdiction is exclusive (a U.S. trial for offenses committed by these individuals is not possible in Germany)." USAREUR Reg. 550–56; USNAVEUR Instr. 5820–13C; & USAFE Reg.1 10–6,

---

7. The NATO Status of Forces Agreement was originally signed on June 19, 1951 by the North Atlantic Treaty Organization member countries. While Germany was not a member at that time, it eventually adopted the agreement by a Supplemental Agreement signed August 3, 1959, adding further provisions. Another supplemental agreement was signed on March 18, 1993, but did not take effect until 1998 and is, therefore, inapplicable to the current case.

8. Effective November 22, 2000, Congress passed the *Military Extraterritorial Jurisdiction Act of 2000,* which provides jurisdiction for U.S. District Courts to try felonies against American civilians employed by or accompanying the Armed Forces outside the United States. 18 U.S.C. § 3261 et seq. (2003). This statute has no retroactive application to the present case.

*Exercise of Jurisdiction by German Courts and Authorities Over U.S. Personnel* (effective December 17, 1992). That, therefore, is the end of the matter. Having failed to demonstrate the exclusive or concurrent jurisdiction of the United States over the Landstuhl housing facility, a necessary element for special territorial jurisdiction to obtain, the Government has failed to prove the Court's jurisdiction over the case and it must be dismissed. *See, In re Bonner,* 151 U.S. 242, 257, 14 S.Ct. 323, 38 L.Ed. 149 (1894); *see also, Bowen v. Johnston,* 306 U.S. 19,25, 59 S.Ct. 442, 83 L.Ed. 455 (1939).

## IV.

Whether Germany should have prosecuted or can or should yet prosecute Morton for the contemptible behavior he admits to remains for that country to decide. The U.S. Government, however, in the courts of this country, has no authority to do so.

The Court **GRANTS** Morton's Motion to Dismiss the Indictment. A separate Order will be entered.

## *ORDER*

In consideration of Defendant Noble L. Morton's Motion to Dismiss Indictment (Paper No. 23), and the Government's Response thereto, it is, for the reasons set forth in the accompanying Opinion, this 24 day of March, 2004, ORDERED:

Defendant's Motion to Dismiss [Paper No. 23] is GRANTED.