## UNITED STATES of America

v.

## Darrell Walter HOLMES, Defendant.

### Criminal Action No. 4:08cr134.

United States District Court,
E.D. Virginia,
Newport News Division.

May 22, 2009.

Lisa Rae McKeel, United States Attorney's Office, Newport News, VA, for United States of America.

Larry Mark Dash, Office of the Federal Public Defender, Norfolk, VA, for Defendant.

### ORDER

ROBERT G. DOUMAR, District Judge.

This matter comes before the Court upon the Motion to Dismiss for lack of jurisdiction and venue, and the Motion to Suppress his admissions, which were filed by Darrell Walter Holmes ("Defendant").

For the reasons set forth below, these Motions are **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Summary

The following facts are not in dispute.

From 1999 until 2002, the Defendant and his wife were both stationed with the U.S. Air Force at Yokota Air Force Base in Japan. During this three-year assignment, they lived in on-base housing with their two children. The oldest of these two children was "Jane Doe"—the Defendant's wife's daughter from a previous relationship. Jane Doe was born in 1994 and was five (5) years old in 1999.

At some point between 1999 and 2002, the Defendant sexually molested Jane Doe on two separate occasions while her mother was in night school and the Defendant was at home taking care of the children.

The incidents went unreported until December 2006, when the mother of Jane Doe, then stationed at Holloman Air Force Base, New Mexico, reported to the Air Force Office of Special Investigations ("AFOSI") that the Defendant had sexually molested Jane Doe while the couple was assigned to Yokota Air Base. Jane Doe was then interviewed by members of the AFOSI at Holloman.

During this interview, Jane Doe explained that the sexual molestation occurred on two occasions when they all lived together on the base at Yokota. She reported that the incidents occurred at the family home on the base. Jane Doe could not pin-point her precise age, but estimated that she was five or six years old and in the first grade. She told the AFOSI that she did not report the incident when it first happened, and did not inform her mother until 2003. According to Jane Doe, she recanted the story sometime after 2003 and the issue did not resurface until an unrelated incident occurred in New Mexico in 2006.

Meanwhile, following his assignment to Japan, the Defendant remained on active duty in the Air Force and was eventually

stationed at Langley Air Force Base in Hampton, Virginia.

In January 2007, Mr. Holmes deployed to Qatar, where he served in support of U.S. combat operations in the Middle East (he remained permanently assigned to Langley Air Force Base for the duration of the deployment to Qatar).

The Defendant eventually redeployed from Qatar to Langley in May 2007. His seventy-seven hour redeployment flight made stops in Kuwait, Germany, Ireland, Baltimore, and Charlotte before eventually arriving in Norfolk at approximately 10:00 p.m. on May 20, 2007.

On May 21, 2007, Mr. Holmes reported to his commander at Langley Air Force Base at approximately 12:00 noon. Shortly thereafter, he was escorted to the Langley office of the AFOSI for interrogation. After approximately two hours of interrogation, Mr. Holmes allegedly made admissions to the AFOSI that were consistent with the information provided by Jane Doe which are the subject of the Motion to Suppress.

## B. Procedural Summary

On or about July 19, 2007, the Air Force charged Mr. Holmes with a criminal violation of the Uniform Code of Military Justice. This charge alleged that between January 1, 2000, and December 31, 2000, Mr. Holmes committed sodomy with Jane Doe while stationed at Yokota Air Force Base, Japan. However, on March 13, 2008, the Air Force dismissed this case after it became clear that the charges were in violation of the statute of limitations.[1]

The matter resurfaced on April 15, 2008, when a Federal Grand Jury sitting in Newport News indicted Mr. Holmes and charged him with two (2) counts of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 7, 2241(c), which are exactly the same charges in this indictment.[2] On May 21, 2008, however, the Government moved to dismiss the original indictment after it became clear that the Government was precluded from prosecuting the Defendant since he was still on active duty with the Air Force. The governing statute, 18 U.S.C. § 3261, (also known as the Military Extraterritorial Jurisdiction Act ("MEJA")), provides that an active

1. In its filings, the Government and the Defendant state that the Uniform Code of Military Justice provides for a five (5) year statute of limitations on such offenses.

2. Subsections 2241(c) and 7(3) provide, respectively, that:

 (c) With Children.—Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the Attorney General, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a)

 and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the person so engaging), or attempts to do so, shall be fined under this title and imprisoned for not less than 30 years or for life.
 18 U.S.C. § 2241(c) (2008).
 The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes: ...

 . . .

 (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.
 18 U.S.C. § 7(3) (2008).

duty member of the military, subject to chapter 47 of Title 10 (the Uniform Code of Military Justice), may not be prosecuted unless he ceases to be subject to the chapter. Judge Morgan of the Eastern District of Virginia granted the Government's motion and dismissed the case against Mr. Holmes, without prejudice. At this time Holmes resided off and on with his girlfriend in Hampton, Virginia, which is in the Eastern District of Virginia.

On October 24, 2008, the Air Force discharged the Defendant Under Other than Honorable Conditions based upon Jane Doe's allegations and his admissions.[3] After his discharge, the Defendant subsequently returned to his home of record in Chicago, Illinois. He went from there to North Carolina by way of Virginia where he stopped on the way.[4]

On November 12, 2008, Mr. Holmes was indicted again by a Grand Jury sitting in Newport News, Virginia, with the same two (2) counts of aggravated sexual abuse of a minor, in violation of 18 United States Code, §§ 7, 2241(c).[5]

At the time this indictment was returned, the Defendant was not in Illinois. However, the Defendant was on November 17, 2008 in North Carolina, where he was appearing before a state court concerning an unrelated dispute. On November 17, 2008, authorities in North Carolina arrested the Defendant and took him before a United States Magistrate Judge in Greenville, North Carolina. The Defendant was then transferred to the Eastern District of Virginia by the United States Marshal's Service, and arrived in the Eastern Dis-

trict of Virginia on or about December 11, 2008.

Counsel for the Defendant filed the present Motion to Dismiss and the present Motion to Suppress on March 2, 2009. On March, 13, 2009, the Government filed a response. On April 16, 2009, the parties appeared before the Court for a hearing on the both the Motion to Dismiss and the Motion to Suppress.

## II. MOTION TO DISMISS THE INDICTMENT

The Defendant's Motion to Dismiss argues that venue is not proper in the Eastern District of Virginia. Secondly, he argues that the Court lacks jurisdiction because the Defendant was a member of the military stationed in Japan when the offense occurred. The Court will address each issue in turn.

### A. Venue

The Defendant argues that under 18 U.S.C. § 3238, the Eastern District of Virginia is the improper venue for this prosecution. Instead, the Defendant contends that North Carolina, Illinois, or the District of Columbia are possible venues for this prosecution—just not the Eastern District of Virginia.

### 1. Standard of Review

█ The government bears the burden of establishing, beyond a preponderance of the evidence, the propriety of venue. *See United States v. Robinson*, 275 F.3d 371, 378 (4th Cir.2001).

---

3. An administrative discharge board uses a preponderance of the evidence standard. (Def.'s Mot. to Suppress 5 n. 6.)

4. An important matter: at all times throughout his military career, Mr. Holmes purport-

edly maintained residency in Illinois and listed his home of record as Chicago, Illinois.

5. The allegations and charges stated in the present indictment are completely identical to the first indictment.

As to crimes conducted outside of the United States, 18 U.S.C. § 3238 is the statute that determines the appropriate venue. The statute states the following:

The trial of all offenses begun or committed ... elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender ... is arrested or is first brought; but if no offender ... [is] so arrested or brought into any district, ... in the district of the last known residence of the offender ... or if no residence is known ... in the District of Columbia.

18 U.S.C. § 3238 (2008).

### 2. Analysis

Being that the criminal allegations occurred on an Air Force base in Japan, there is no question that Section 3238 governs venue considerations in this matter.

What would otherwise be a simple venue issue is complicated by two separate concerns: (1) the fact that the Defendant was previously arrested and charged for this same offense (with those charges eventually dismissed in favor of another indictment for the same offense); and (2) the fact that the Defendant was a servicemember stationed in Hampton, Virginia, where he had his girlfriend. He was listed as a resident of Illinois for the duration of his military career.

### a. First Arrested

Under 18 U.S.C. § 3238, when the offending conduct occurs "out of the jurisdiction of any particular State or district," venue "shall be in the district in which the offender ... is arrested or is first brought...." *Id.*

The Fourth Circuit has held that the statute's language that states "is arrested or is first brought" means simply "arrested," that is that the venue is in that district "within the United States where the offender is first restrained of his liberty in connection with the offense charged." *U.S. v. Erdos,* 474 F.2d 157, 160 (4th Cir. 1973) (citing *United States v. Ross,* 439 F.2d 1355, 1358 (9th Cir.1971); *United States v. Provoo,* 215 F.2d 531, 537 (2d Cir.1954); *Chandler v. United States,* 171 F.2d 921, 927, 932–33 (1st Cir.1948); *Kerr v. Shine,* 136 F. 61, 63–65 (9th Cir.1905)).

The Defendant argues that in this case, the first arrest occurred in North Carolina since the Defendant is presently subject to an indictment returned in November 2008.

The Government, however, argues that the Defendant's first arrest occurred in Virginia when he was subject to an identical indictment returned in March 2008 (that indictment was subsequently dismissed). *See United States v. Holmes,* No. 4:08cr34 (E.D.Va. May 21, 2008) (order granting motion to dismiss).

The issue before this Court appears to be one of first impression: in a matter subject to 18 U.S.C. § 3238, does a Defendant's prior arrest for the same charges under a subsequently dismissed indictment constitute a "first arrest" for purposes of venue in a criminal prosecution?

The Court finds that the Defendant's first arrest for this offense occurred in Virginia when he was subject to the same charges in a March 2008, which was subsequently dismissed without prejudice by Judge Morgan in criminal case number 4:08cr34.

The most relevant Fourth Circuit opinion comes from *United States v. Erdos,* 474 F.2d 157 (4th Cir.1973). In *Erdos,* the court dealt with the arrest of a defendant accused of murdering a fellow American at the U.S. Embassy in Equatorial Guinea. Upon his return to the United States, the defendant was first placed into custody in the Eastern District of Virginia. *Id.* at

160–61. The matter was complicated, however, by the fact that the defendant's plane first landed in Boston en route to Dulles International Airport. The court rejected the defendant's claim that venue was proper in Boston. *Id.* at 161. The court concluded that the defendant's liberty was not impeded until he landed at Dulles Airport and was first served with the complaint and summons. *Id.* Even if not arrested at Dulles, he was ultimately arrested at Alexandria, which was also in the jurisdiction of the Eastern District of Virginia. *Id.*

Unfortunately, though, this case is not directly on point as the defendant in *Erdos* was not operating under a previously dismissed indictment—Erdos entered the United States with an indictment waiting for him.

In *United States v. Provoo,* 215 F.2d 531 (2d Cir.1954), a soldier was held in custody in Maryland for "sodomy" charges. The Army, however, delayed trial and eventually dismissed the case when it learned that the Department of Justice was pursuing charges of "treason" against the defendant for crimes he allegedly committed as a prisoner of war during World War II. The Army kept Provoo in custody and transported him to New York where he was discharged and turned over to the custody of the FBI. He was then indicted and eventually convicted of "treason" at a trial in New York.

On appeal, the Defendant argued that Maryland was the proper venue for his treason case. The Justice Department, however, argued that venue was proper in New York, being that New York was the location of the prosecution of the "treason" case against the defendant.

The Second Circuit disagreed with the government and found venue to be proper in Maryland. The court determined that there could be no other reason that the Army kept the defendant in custody after the sodomy charges were dropped than to detain the defendant for his treason charges. Under that reasoning, it became apparent that the location where Provoo first went into custody for the "treason" case was Maryland and not New York.

That is where the *Provoo* case is akin to the current prosecution against Mr. Holmes. When the U.S. Attorney's office in Newport News dismissed its April 2008 indictment against him, it released him because his active duty status prevented Federal prosecution until he left the Air Force.

Under this reasoning, the Eastern District of Virginia is the district where the Defendant was first arrested, even though it is not where Mr. Holmes first went into custody under *this indictment.* Indeed the prosecution against him first started in the Eastern District of Virginia, but being that he was released after the dismissal of the first indictment, the Government had to await his discharge to renew the prosecution against him.

#### b. "Residence"

In the alternative, the Government argues that the venue lies in Virginia based upon the Defendant's last known residence. Indeed, 18 U.S.C. § 3238 states that "... but if such offender or offenders are not so arrested or brought into any district, an indictment or information maybe filed in the district of last known residence of the offender...." The Government contends that the Defendant's last known address was in the Eastern District of Virginia "as he was stationed in Hampton, Virginia." (Resp. to Pretrial Mot. 4.)

As addressed earlier, the Defendant was first placed into custody for this current indictment in the Eastern District of North Carolina (Greenville, North Car-

olina). Under § 3238, this would possibly make the Eastern District of North Carolina the proper place of venue.

However, in *United States v. Layton*, 519 F.Supp. 942 (N.D.Cal.1981), the court interpreted the statute to mean that if an indictment is filed before the offender is arrested in this country, the case may be filed in the district of the offender's last known residence, thereby permitting the trial to be held in the district where the indictment was filed rather than in the district where the offender is subsequently arrested or first brought. *Id.* at 943.

In *Layton*, the defendant was indicted for murdering a U.S. Congressman in Guyana. At the time that the indictment was filed, Layton was in prison in Guyana pending the resolution of charges brought against him in that country. The indictment was filed in the Northern District of California, which was the district of Layton's last known residence. Following his release from the prison in Guyana, FBI agents took him into custody and escorted him to San Francisco, via New York. During a stopover in New York, Layton was removed from the airplane and arraigned. Immediately thereafter, the FBI escorted him to San Francisco to face trial.

The parties all conceded that the Layton's last known residence in the United States was California, but nonetheless Layton argued that venue was proper in New York and not San Francisco, being that was the place where he was first brought to the United States. The defendant read the clauses in § 3238 conjunctively, that is he argued that even though an indictment may be filed in the district of the offender's last known residence, the trial must always be held where the offender is arrested or first brought.

The district court in California held otherwise, finding that venue was proper in California because he had been indicted while still abroad. *Id.* at 946 ("[T]he words 'but if,' which preface the second clause, can only be read as making an exception to the first clause.").

To reach that conclusion, the court conducted a thorough examination of the legislative history of 18 U.S.C. § 3238. The court noted that the primary purpose accomplished by the provision for filing an indictment in the district of the offender's last known residence was to prevent the running of the statute of limitations where an offender remained abroad but was not clearly a fugitive. *Id.* at 944.

[T]he original purpose of section 3238 was simply to provide an arbitrary rule of venue for offenses committed outside of the United States. The place of the venue seems to have been arbitrarily fixed at the place where the criminal process is first set in motion. When the statute was amended in 1963, Congress provided a means of setting that process in motion earlier than had formerly been permitted that is, by filing an indictment in the district of his last known residence even though the offender has not yet been found in or brought to this country. There appears no reason why Congress would want to interrupt the proceedings, once begun, to move them to the district where the defendant later happened to be brought.

*Id.* at 945.

The court also looked to help from the ordinary rule which holds that "an indictment is proper only if filed in a district where venue for trial is proper." *Id.* (citing 8A Moore's Fed. Practice 18.02(1)). Accordingly, the court determined that if Congress had intended to make a rule at odds with the common understanding of the consequence of a proper indictment, "it would have unambiguously done so." *Id.*

Additionally, the court found that "no public policy suggests that Congress intended that venue should lie in the district where the offender was 'first brought' once an indictment has been returned in the district of his last known residence." *Id.*

■ In this case, based upon the informed guidance from *Layton*, the Court finds that the second clause of § 3238 applies to the Defendant, Mr. Holmes. Since the indictment was filed before he was arrested in this country, *Layton* instructs that the indictment may be filed in the district of his last known residence. Consequently, the trial may follow in the place where he was properly indicted.

There is one caveat, though. The *Layton* case was made simple by the fact that the government and the defendant could agree over the defendant's last known residence in the United States. *Id.* at 943. Not so with our case. The Government argues that the last known residence of the defendant was Hampton, Virginia, and this Court so finds. The Defendant argues that he was not a resident of Virginia when the indictment was returned—or at any time prior to that—being that he was on active duty in the Air Force and remained a citizen of Illinois both during and after his service.

### c. Last Known Residence for Military Personnel

Determining the proper place of residence in this case is complicated by the fact that Mr. Holmes was a member of the United States Military. When the first indictment was returned in April 2008, the Defendant was on active duty, but he also lived with his girlfriend in the Eastern District of Virginia. By the time that the present indictment was returned in November 2008, the Defendant had left the

Air Force and, allegedly, had returned to his home of record in Chicago, Illinois. The Government testimony indicates, though, that the Defendant's last known address was in the Eastern District of Virginia where his girlfriend resided.

■ Domicile is distinguished from residence [6] in that an individual may have more than one residence but only one domicile. *Gambelli v. United States*, 904 F.Supp. 494, 496 (E.D.Va.1995) (citing *Comm'r of Internal Revenue v. Nubar*, 185 F.2d 584, 586 (4th Cir.1950)). *See also Myers v. Comm'r of Internal Revenue*, 180 F.2d 969, 971 (4th Cir.1950) ("... for a person may have two places of 'residence' as in the city and country, but only one 'domicile.'").

■ When it comes to members of the armed forces, a service member "does not change his citizenship by entering the military service even though he is assigned to duties in another state or country, and regardless of the term of service, unless he indicates an intent to abandon such original domicile and adopt a new one." *Gambelli*, 904 F.Supp. at 496–97 (quoting *Deese v. Hundley*, 232 F.Supp. 848, 850 (W.D.S.C.1964)). "A change in domiciliary, according to *Deese*, requires an act of volition; *residence* at a duty station is in response to an order...." *Gambelli*, 904 F.Supp. at 497 (emphasis added).

This clearly contemplates that a member of the military—even though he did not change his state of citizenship—can be a resident of the place in which he is stationed. Accordingly, when Holmes was stationed at Langley Air Force Base, he was residing for purposes of § 3238 in the Eastern District of Virginia.

---

**6.** "Although often used interchangeably, the terms domicile and residence are distinct legal terms." *United Co. v. Keenan*, 2006 WL 2994989, at *3 (W.D.Va. Oct. 20, 2006).

The question remains, though, where was his last known residence when this indictment was returned? The Court finds that the answer to that question is the Eastern District of Virginia.

At hearing, Special Agent Kim Wright of the FBI, who was the case agent for the investigation of the Defendant, testified that she believed that the Defendant's last known address was in the Eastern District of Virginia. She testified that the Defendant, while stationed at Langley, lived in and around Hampton, Virginia. Additionally, the Defendant maintained a relationship with a girlfriend who lived in Newport News, Virginia. The Defendant maintained a car that was registered in Hampton, Virginia, and its registration was not set to expire until June 2010. In addition, Agent Wright testified that her work with Air Force personnel during her investigation of Mr. Holmes showed that he resided in Hampton, Virginia. Agent Wright stated that it was her belief at the conclusion of her investigation that the Defendant was either living in Hampton, Virginia, or was living with his girlfriend in Newport News—cities that are both located within the Eastern District of Virginia. To the FBI, the last known residence of the Defendant when the November 12, 2008 Indictment was returned was the Eastern District of Virginia.

The Defendant also testified that he last lived at 10 Cavalier Road, Hampton, Virginia, and moved from that address on October 24, 2008. Additionally, he testified that he drove to Chicago, Illinois on October 26, 2008. He lived there for 3–4 weeks before he traveled to an unrelated court hearing in North Carolina. En route to the hearing in North Carolina, the Defendant stopped over in Hampton, Virginia.

The Probation Officer who was also assigned to Mr. Holmes' case testified that the Defendant's bond was conditioned upon him living at 410 N. Chalice Court, Newport News, Virginia, which was the address of his girlfriend with whom he had previously lived.

Therefore, pursuant to 18 U.S.C. § 3238, because an indictment was returned against the Defendant before he was arrested, and because the last known residence of the Defendant when the grand jury returned the present indictment (in November 2008) was within the Eastern District of Virginia, this Court finds that venue for this criminal matter is proper within the Eastern District of Virginia. The Court is aware that the Defendant's state of citizenship throughout his military career was Illinois. The Court is also aware that the Defendant obtained an Illinois driver's license on November 5, 2008. However, if this Court were to find that venue was improper, it would thereby place an unnecessary burden upon the Government. It is not the Government's place in our society to have real-time information of the whereabouts of its citizenry at all times. Rather, the Government must place a good faith effort into the filings of it is indictment and the information contained therein. The information provided at hearing showed that the investigators did just that. All indications were that the Defendant was a resident of the Eastern District of Virginia both before and during the investigation leading up to the November 2008 indictment. He had substantial and lasting ties with the community and investigators had no indication that the Defendant would immediately bolt from the area upon his discharge from the Air Force.

**B. Jurisdiction**

The indictment in this case charges Mr. Holmes with two counts of a violation of 18 U.S.C. §§ 7(3), 2241(c). The Indictment claims jurisdiction by virtue of the offense

taking place within "the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2241(c).

■■■ As with all lower federal courts, this Court may only exercise the subject matter jurisdiction conferred upon it by Congress. *United States v. Pence*, 2006 WL 3091091, at *1 (W.D.Va. Oct. 27, 2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 452, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004)). Congress has the power to criminalize sexual abuse of a underage citizen, regardless of where that sexual abuse may occur. *United States v. Morton*, 314 F.Supp.2d 509, 512 (D.Md.2004). As identified in *Morton*, the jurisdictional issue concerns "whether Congress has in fact exercised this power with regard to the criminal statutes involved in the present case, and whether those statutes provide jurisdiction based upon the facts of this case." *Id.* (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)). Section 2241 of Title 18 establishes federal jurisdiction over the offense of aggravated sexual abuse of a child "in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2241(c) (2008).

A "special maritime and territorial jurisdiction of the United States" is defined, in pertinent part, as the following:

The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes: ...

. . .

... (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building. . . .

. . .

Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.

18 U.S.C. § 7 (2008)

The Defendant contends that jurisdiction is improper within a federal district court: 1) because 18 U.S.C. § 7 "does not apply with respect to an offense committed by a person described in section 3261(a) of this title"; 2) because the indictment alleges offenses conducted before the enactment of MEJA,[7] therefore § 3261 does not grant the Court jurisdiction over this matter; and 3) because the offense is governed by the Status of Forces Agreement ("SOFA") between the United States and Japan, the only entities that have jurisdiction are the United States Military and the government of Japan. (Def.'s Mot. to Dismiss 6–8 (citing 18 U.S.C. § 7).)

■■■ As a preliminary matter, the Court will address whether or not MEJA applies to this case at all.

Section 3261 of Title 18 of the United States Code provides for the prosecution of criminal offenses committed by members of the Armed Forces outside of the United States. It states:

Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States ... (2) while a member of the Armed Forces subject to chapter 47

---

7. MEJA did not go into effect until November 22, 2000. *See* 18 U.S.C. § 3261.

of title 10 [10 U.S.C.S. §§ 801 et seq.] (the Uniform Code of Military Justice), shall be punished as provided for that offense.

18 U.S.C. § 3261(a) (2008).

As the Defendant makes clear, the alleged conduct began in 1999, which was before MEJA went into effect.[8] The Government contends, though, that it cannot provide accurate dates because the victim in this matter is unable to pin-point precise dates of the offensive conduct, and it fully concedes that all of the alleged conduct may have occurred prior to the MEJA going into effect. Consequently, the MEJA is not controlling in this matter—a finding otherwise would have impermissible ex post facto effect. *See Morton*, 314 F.Supp.2d at 514 n. 8 (determining that MEJA has no retroactive application to felonies alleged to have occurred prior to the passage of the statute). *See generally United States v. Campanale*, 518 F.2d 352, 364 (9th Cir.1975) (holding that at least one criminal act must occur after the effective date of the governing statute so as to put those who had committed the act on notice); *United States v. Wechsler*, 392 F.2d 344 (4th Cir.1968) (noting that a crime completed before the date in which the governing statute was enacted could not be prosecuted without running afoul of ex post facto law).

■ The Court must now address whether or not this Court has jurisdiction over the offense, given that the alleged criminal activities occurred at a U.S. Air Force Base in Japan.

The Defendant claims that prior the enactment of MEJA, the federal courts had little to no jurisdiction over criminal offenses committed on foreign soil by American citizens. In support of this position, the Defendant cites *United States v. Gatlin*, 216 F.3d 207 (2d Cir.2000), which held that a U.S. District Court lacked jurisdiction over a crime committed on property leased in Germany by the United States Military. In *Gatlin*, the court determined that in 18 U.S.C. § 7(3), Congress "intended for the statute to apply only to lands within the territorial boundaries of the United States" and not to military installations located abroad. *Id.* at 216.

Unfortunately for the Defendant, this is not the Second Circuit. The Fourth Circuit has determined that § 7(3) grants special territorial jurisdiction to American installations located outside of this country's territorial boundaries. *United States v. Erdos*, 474 F.2d 157 (4th Cir.1973). *Erdos* involved a killing in the United States embassy in Equatorial Guinea of an American citizen by another American citizen. The defendant was tried and convicted in the Eastern District of Virginia for violating 18 U.S.C. § 1112, which prohibits manslaughter in the "special maritime and territorial jurisdiction of the United States." *Id.* at 158. The court concluded that § 7(3) "is a proper grant of 'special' territorial jurisdiction embracing an embassy in a foreign country acquired for the use of the United States under its concurrent jurisdiction." *Id.* at 160.

In a nearly identical case to the present matter, the Ninth Circuit determined that § 7(3) covers criminal acts that occurred on Yokota Air Force Base, Japan—the same location where the Defendant is alleged to have committed the present offense. *United States v. Corey*, 232 F.3d 1166, 1177 (9th Cir.2000) (finding that the United States had jurisdiction to prosecute a defendant, alleged to have committed

---

8. The allegations brought by Jane Doe occurred between 1999 and 2002; the MEJA did not go into effect until November 2000.

acts in violation of 18 U.S.C. §§ 2241(a) and 2242(1)).

In evaluating the jurisdictional reach established under § 7, the Fourth Circuit laid out a two-part inquiry: whether the lands are "reserved or acquired for the use of the United States *and* under it exclusive or concurrent jurisdiction." *Erdos* 474 F.2d at 160 (emphasis added). *See also Corey,* 232 F.3d at 1176.

As to the first part of the inquiry, "there is not much question that the Yokota Air Force Base has been acquired for the use of the United States." *Id.* at 1177.

As to the second part of the inquiry ("exclusive or concurrent jurisdiction"), the question is really one of "legislative jurisdiction." *Id.* (quoting Restatement (Third) of the Foreign Relations Law of the United States § 401 (1987) ("the jurisdiction to prescribe")). Under the rule established in *Erdos,* the court must consider "whether the United States enjoys such control over the area that the law should constructively regard it as United States territory." *Corey* at 1178. The answer to that question is yes. At Yokota Air Base, the SOFA with Japan does not limit the ability of the federal courts to exercise jurisdiction over offenses conducted on American military bases located abroad. *Id.* at 1181. While the SOFA with Japan "delimit[s] the respective spheres of jurisdiction over the territory reserved for the use of American soldiers and diplomats", the *Corey* court found that the SOFA actually leaves the U.S. with "substantially greater authority to regulate conduct than the host country." *Id.*

The United States exerts practical dominion over activities on the Yokota Air Force Base. The SOFA with Japan provides that "[w]ithin the facilities and areas, the United States may take all the measures necessary for their establishment, operation, safe-guarding and con-

trol." That broad language alone would confer upon Congress the legislative jurisdiction to prescribe and enforce the laws necessary for the management and security of the Yokota Air Force Base. But, Article XVII [of the SOFA] goes farther and explicitly grants the U.S. military the authority to exercise criminal jurisdiction over all persons subject to military law. Where jurisdiction is concurrent, the SOFA grants the United States the primary right to try U.S. military and civilian personnel for offenses committed solely against U.S. security, property or persons.

*Id.* at 1181–82 (citations omitted).

The language of the SOFA clearly provides Congress with the ability to enforce the laws necessary to regulate persons stationed at Yokota Air Base. Section 7 legislatively provides the federal courts with jurisdiction over offenses committed within the special maritime and territorial jurisdictions of the United States. It is apparent to this Court, based upon the plain meaning of the statute, and the relevant international agreements involved, that Congress intended to extend Section 7 "as far as U.S. dominion." *Id.* at 1183.

In the Defendant's mind, the existing SOFA only provides for concurrent jurisdiction as between the United States Military Courts and the Japanese government, thereby excluding the federal courts from jurisdiction over these offenses because the Defendant was an active duty member of the Air Force when the alleged events occurred.

The Court finds this distinction to be of no consequence. A federal district court is not precluded from jurisdiction simply because the Uniform Code of Military Justice gives jurisdiction to punish a member of the armed forces for crimes committed on military installations. *See*

*United States v. Walker*, 552 F.2d 566, 567–68 (4th Cir.1977) (addressing defendant's argument that the portion of the military code prohibiting drunk driving thereby protects a servicemember from prosecution under a similar federal offense). "[F]ederal courts have at the very least concurrent jurisdiction with military courts over violations of the laws of the United States by military personnel whether on or off the military reservation." *Id.* at 567 (citing *Grafton v. United States*, 206 U.S. 333, 348, 27 S.Ct. 749, 51 L.Ed. 1084 (1907)). "[S]imply because a member of the armed forces may be punished by military court martial for an offense provides no justification for concluding that a District Court lacks jurisdiction to punish him for the same offense, if such offense is violative of a federal law." *Walker*, 552 F.2d at 567.

Therefore, based upon the relevant case law and the undisputed facts of this case, it is clear that the offenses alleged to have occurred on Yokota Air Force Base between 1999 and 2002 fall within the jurisdictional reach of the Federal courts.

## III. *MOTION TO SUPPRESS STATEMENTS*

The Defendant alleges that the incriminating statements made on May 21, 2007, should be suppressed as they were products of an unlawful interrogation. Specifically, the Defendant claims that he was suffering from jet lag when he received a three-hour interrogation from investigators with the AFOSI personnel at Langley Air Force Base. Additionally, the Defendant claims that the AFOSI's comments urging him "to consider that the victim might be spared the stress of going through court and might be able to get the help she needed if he confessed and explained what happened" were unnecessarily coercive. (Def.'s Mot. to Suppress 5.)

Even though the Defendant received his *Miranda* warnings, he argues that his confession was involuntary under the "totality of the circumstances." *Id.* (citing *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir.1987)). In evaluating the voluntariness of the statement, the Defendant contends that the Court must consider whether the Defendant's "capacity for self determination [was] critically impaired." *Id.* at 1071–72.

### A. Applicable Law

 "The requirement that *Miranda* warnings be given does not … dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). However, a statement following *Miranda* warnings will "rare[ly]" be deemed involuntary. *Id.*

 A condition precedent to a finding of involuntariness is coercive government conduct. *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). But, this does not mean that the circumstances surrounding the interrogation must be entirely free from intimidation. *Pelton*, 835 F.2d at 1072. Under the "totality of the circumstances" analysis, courts must consider the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Braxton*, 112 F.3d 777 (4th Cir.1997) (en banc).

 Additionally, a defendant's weakened mental state does supply a sole basis for suppression. In *United States v. Cristobal*, 293 F.3d 134 (4th Cir.2002), the Fourth Circuit considered the admissibility of a statement made one day after the defendant had received multiple gunshot wounds, had undergone life-saving surgery, and had received significant amounts of medication in connection with his inju-

ries. The Court rejected the defendant's efforts to suppress the confession because the evidence did "not show that law enforcement officials exploited [the defendant's] weakened condition with coercive tactics." *Id.* at 141. *See also Connelly*, 479 U.S. at 163–67, 107 S.Ct. 515 (defendant's psychiatric issues alone did not render confession involuntary without additional coercion).

## B. Analysis

■ The Defendant argues that statements made during his interrogation were involuntary because they occurred only 12 hours after his 77–hour flight back to the United States. He claims that an evaluation under the "totality of the circumstances" proves that the statement was extracted by direct or implied promises, and occurred after his will was overborne.[9]

Indeed, some courts have found that sleep deprivation can make statements involuntary. *See Whiting v. Burt*, 2006 WL 381647, at *2–6 (E.D.Mich. Feb. 16, 2006) (suppressing a statement made after the defendant was shackled to a chair for 11½ hours and had gone 30 hours without sleep). But, in other cases, courts have not suppressed statements when a defendant was tired due to conditions or circumstances outside of the control of the interrogators. *See Pinckney v. Scribner*, 2009 WL 499081, at *6–10 (E.D.Cal. Feb. 25, 2009) (overruling the defendants objections when the court found that his sleep deprivation was not due to the coercive tactics of law enforcement).

In the instant case, there are no alleged facts indicating that there was coercive police activity. The Defendant was likely tired from his trip, but he had also received 12–hours of rest prior to his meeting with security personnel. The Supreme Court has held that in order for a statement to be deemed involuntary, there must be "a substantial element of coercive police conduct." *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Interrogating a person after he had traveled on a long flight from the Middle East (and had slept the night before) does not rise to the level of substantial coercion.

At hearing, Special Agent Keith King of the AFOSI testified that interrogators made repeated efforts to ensure that the Defendant's statements were voluntary and free from coercion. The interrogators informed the Defendant of his right against self-incrimination. They also repeatedly asked him if he was feeling well after his trip, if he was rested, and they offered him refreshments. They also offered him a bathroom break during the interrogation. Special Agent King testified that at no time did the Defendant say that he was tired, appear to nod off, or ask for the interrogation to stop. Additionally, Special Agent King reported that the interrogators did not employ handcuffs or apply any use of force to subdue the Defendant during their questioning.

The Court finds that there is simply no evidence to suggest that any of the interrogators used techniques that contained a

**9.** Defendant also contends that after having worked "in a high stress combat support assignment for approximately five (5) months, AFOSI agents should have realized that he was incapable of a voluntary interrogation. (Def.'s Mot. to Suppress 6.) At hearing, the Court learned that Air Force personnel assigned to Qatar are provided with above average billeting, are in close proximity to recreational facilities, and have daily access to American fast-food. Based upon the information presented at hearing, the Court finds that the conditions in Qatar are not austere, are not excessively stressful, and did not adversely affect the circumstances of the Defendant's interrogation.

"substantial element of coercive police conduct."

■■■ The Defendant next objects to statements made during the interrogation in which the officers urged him to consider the plight of the victim. The Defendant contends that this interview technique constituted impermissible psychological coercion. Again, the Court finds that this does not meet the "substantial" coercion necessary to make the Defendant's statement involuntary.

■■■ "Truthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton,* 112 F.3d at 782 (internal quotations omitted). *See also United States v. Mashburn,* 406 F.3d 303, 309–10 (4th Cir.2005) (finding that it was not impermissible for interrogators to advise the defendant of penalties he faced if convicted and telling him that the only way he could help himself was to accept responsibility and cooperate).

Here, the allegations of coercion by the AFOSI (reminding the Defendant of the harm to the victim, or encouraging the Defendant to spare the victim further pain) does not meet the criteria required to suppress his statements. At no time was any evidence presented suggesting that the Defendant's will to resist was overborne by improper interview techniques. It appears to this Court that the interrogators did nothing more than provide the Defendant with truthful statements about the Defendant's predicament and the victim's circumstances.

Moreover, it is important to recall that the Defendant had assented to the interrogation and had received his *Miranda* warnings prior to the entire line of questioning (thereby raising the standard of involuntariness).

Accordingly, the Defendant's Motion to Suppress is denied as the agents did not engage in any unlawful coercive activity. This Court concludes that the Defendant's statement was voluntary and his will was not overborne.

## IV. *CONCLUSION*

The Defendant's Motion to Dismiss and Motion to Suppress are **DENIED.**

Venue is proper in the Eastern District of Virginia as it is the site of the Defendant's first arrest for these charges, and it is also the location of the Defendant's last known residence. Moreover, this Court has jurisdiction over the criminal matter, being that the events giving rise to the Criminal Indictment occurred at Yokota Air Base, Japan, which is a special maritime and territorial jurisdiction of the United States.

Moreover, the Defendant's statements made to agents of the AFOSI will not be suppressed, as there was no substantial element of coercive police conduct on the part of the Air Force interrogators. The evidence produced before this Court clearly establishes that the Defendant's statement on May 21, 2007, was made voluntarily and was free from impermissible coercion on the part of law enforcement.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**