**UNITED STATES of America,
Appellee,**

v.

**Alfred ERDOS, Appellant.**

**No. 72–1328.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1972.

Decided Feb. 14, 1973.

William E. McDaniels and Aubrey M. Daniel, III, Washington, D. C. (Williams, Connolly & Califano, Washington, D. C., on brief), for appellant.

Justin W. Williams, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and CRAVEN and WIDENER, Circuit Judges.

CRAVEN, Circuit Judge:

On August 30, 1971, in the American Embassy in the new Republic of Equatorial Guinea, Alfred Erdos killed Donald Leahy. Both were American citizens and embassy employees, with Erdos occupying the position of senior diplomat or charge d'affaires.

Returned to the United States, Erdos was tried and convicted of voluntary manslaughter [1] in the District Court for the Eastern District of Virginia. On appeal, the more important issues raised are whether the district court: (1) had jurisdiction to try Erdos for a crime occurring within an American embassy located in a foreign country; (2) erred in holding that venue lay in the Eastern District of Virginia rather than the Dis-

---

1. 18 U.S.C. § 1112 provides:
    (a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
    Voluntary—Upon a sudden quarrel or heat of passion.
    Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

    (b) Within the special maritime and territorial jurisdiction of the United States,
    Whoever is guilty of voluntary manslaughter, shall be imprisoned not more than ten years;
    Whoever is guilty of involuntary manslaughter, shall be fined not more than $1,000 or imprisoned not more than three years, or both.

trict of Massachusetts where the plane bearing Erdos first landed; and (3) improperly curtailed the cross-examination of a psychiatrist from a psychiatric treatise. We conclude there was jurisdiction and venue, and that the district judge's error in curtailing cross-examination was not sufficiently prejudicial to require reversal. We have also considered the other 13 assigned points of error and find them to be without merit. Accordingly, the judgment below will be affirmed.

### Jurisdiction

The district court based jurisdiction upon 18 U.S.C. § 7, which provides in part:

The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:

.  .  .  .  .  .

(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, *or* any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building. [Emphasis added].

■■■ ▪ The power of Congress to lawfully proscribe the killing of an American citizen by another American citizen within a diplomatic compound located in a foreign country is, we think, beyond question. U.S.Const. art. III, § 2; United States v. Flores, 289 U.S. 137, 146–147, 53 S.Ct. 580, 77 L.Ed. 1086 (1933); United States v. Bowman, 260 U.S. 94, 96–98, 43 S.Ct. 39, 67 L.Ed. 149 (1922). The·problem is not one of power but of intention, *i. e.*, statutory construction. Erdos contends that the district court lacked jurisdiction to try him for an offense committed outside the territorial limits of the United States because Congress has not exercised its constitutional power so as to extend American criminal court jurisdiction to the United States Embassy in Equatorial Guinea. It is urged that 18 U.S.C. § 7(3) must be read to apply only to areas within the geographical boundaries of the United States and may not be given extraterritorial effect.

■■ The embassy in question is leased by the United States from a private citizen of the new Republic of Equatorial Guinea. This lease agreement does not itself defeat criminal jurisdiction, however, since fee simple "ownership" of the property by the ·United States is not a prerequisite to such jurisdiction. As the court in United States v. Archer, 51 F.Supp. 708 (S. D.Cal.1943), said at 709:

A consulate is, ordinarily, a building owned by the Government of the United States. And although it be not owned by the United States, it is a part of the territory of the United States of America.

In *Bowman, supra*, 260 U.S. at 98–99, 43 S.Ct. 39, both public and *private* ships on the high seas were characterized as "constructively" a part of the territory of the United States. Subsection (3) is not framed in the language of conveyancing. The test, as to property within or without the United States, it one of practical usage and dominion exercised over the embassy or other federal establishment by the United States government.

■ The much harder question is whether the third phrase of § 7(3) (dealing with places acquired by the federal government with the consent of the states and thus presumably within the territorial boundaries of the United States) modifies and limits the more general coverage of the preceding two phrases. The meaning is not perfectly clear. Nor is the legislative history.[2] Such an interpretation is not implausible, and, indeed, it is possible that when the statute was enacted the attention of the Congress was not in the slightest fo-

---

2. *See e. g.*, 42 Cong.Rec. 590, 1186 (1909) (remarks of Senator Heyburn and Congressman Sherley).

cused on extraterritorial jurisdiction. But if so, why the broad general language of phrases one and two—wholly unnecessary to implement the establishment of forts, dockyards and other needful buildings within the states plainly accomplished by phrase three?

■ Where the power of the Congress is clear, and the language of exercise is broad, we perceive no duty to construe a statute narrowly. The first two phrases connected by the conjunctive "and" relate to and modify each other. The result is to create a jurisdictional category: lands reserved or acquired for the use of the United States and under its exclusive or concurrent jurisdiction. It is only the third phrase, separated from the first two by a comma and the disjunctive "or," that limits jurisdiction to places acquired (within the United States presumably) by the consent of state legislatures. We think the third phrase is independent of and does not modify the first two, and so read, the sentence describes two kinds of places or lands within the "special" jurisdiction of the United States.

■■ We hold that 18 U.S.C. § 7(3) is a proper grant of "special" territorial jurisdiction embracing an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction. We further hold that 18 U.S.C. § 1112 is a specific grant of subject matter jurisdiction with respect to manslaughter committed at a place within the special maritime and territorial jurisdiction of the United States.

*Venue*

Venue, in cases of crimes committed outside any district, is controlled by 18 U.S.C. § 3238,[3] which provides in part that venue shall be in the district within the United States where the offender "is arrested or first brought." The statute has a long history.[4] It was first enacted in 1790, amended in 1825, again in 1874, and most recently in 1963. In its original form, the statute used the word "apprehended." The 1825 version used the words "first apprehended." In the 1874 version the word "found" was substituted for the words "first apprehended," but in the latest reenactment, the Congress reverted to the original idea of restraint and substituted the word "arrested" for the word "found." The legislative history of the 1963 version explains that "The term 'found' in most cases means 'arrested.'" 1963 U.S. Code Cong. & Ad.News 660.

■ The various versions of the statute have been construed time and again. *E. g.*, United States v. Provoo, 215 F.2d 531, 537 (2d Cir. 1954); United States v. Townsend, 219 F. 761, 762 (2d Cir. 1915). The cases seem to agree, whether construing the words "found," "apprehended," or "first apprehended," that the Congress had restraint in mind. We think the phrase in the current version of the statute that venue shall be in the district in which the offender "is arrested or is first brought" means simply "arrested"—*i. e.*, that venue is in that district within the United States where the offender is first restrained of his liberty in connection with the offense charged. Obviously, "first brought" could plausibly be interpreted to mean what it says, so that wherever an offender (traveling by air) touches down in the United States, that is the place where trial must be had.

3. 18 U.S.C. § 3238 provides:
The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

4. *See* Orfield, Venue in Federal Criminal Cases, 17 U.Pitt.L.Rev. 375, 393–398 (1956).

But it is settled otherwise. "First brought" within the context of the statute means first brought *in custody* with liberty restrained. United States v. Ross, 439 F.2d 1355, 1358 (9th Cir. 1971); *Provoo, supra*, at 537; Chandler v. United States, 171 F.2d 921, 927, 932–933 (1st Cir. 1948); Kerr v. Shine, 136 F. 61, 63–65 (9th Cir. 1905).

The commercial airplane in which Erdos returned to the United States was scheduled to make its initial landing in the United States at Dulles International Airport—located in the Eastern District of Virginia. Instead, it made an unscheduled intermediate stop in Boston, Massachusetts.

Erdos contends that the District of Massachusetts is the district with exclusive venue because that is the district into which he was "first brought." He would be correct but for the judicial gloss, to which we have adverted, that has long since been applied to the statute.

The district court found as a fact that Erdos was not in custody on the return flight to the United States, nor in Boston, stating that "all the evidence was he was free to go where he wanted to," even when the plane landed at Dulles.[5] The district court, consequently, determined that Erdos was "first found" at Dulles when he was served with the complaint and summons upon his arrival there. For reasons previously stated, we read "first found" as meaning arrested. But it does not matter, for the record is clear that, if not arrested at Dulles, Erdos was subsequently arrested at Alexandria, also within the jurisdiction of the district court.

Findings of fact by a district court in a criminal case may not be disturbed on appeal unless they are clearly erroneous. Campbell v. United States, 373 U.S. 487, 493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); United States v. Graves, 428 F.2d 196, 200 (5th Cir. 1970). After carefully examining the record we believe there was ample evidence from which the district court could find that Erdos was *not* in custody within the meaning of 18 U.S.C. § 3238 when his flight landed in Boston and, therefore, that venue was appropriate in the Eastern District of Virginia since that was the district in which he was first arrested.

### Cross-Examination

At trial Erdos admitted killing Leahy and pleaded insanity as his defense. In furtherance of his defense, Erdos called as witnesses four psychiatric nurses who had attended him during his hospitalization and two psychiatrists. In rebuttal the government called two court-appointed psychiatrists, both of whom testified on direct examination that Erdos was only feigning mental illness after he killed Leahy.

While cross-examining one of the court-appointed psychiatrists, counsel for Erdos attempted to question the witness from an apparently recognized psychiatric treatise. The district judge sustained the government's objections to the use of the psychiatric treatise after the witness said that he had "read portions of it . . . [but was] not familiar with the whole text."

There has been much progress in recent years toward expanding the "learned treatise" exception to the hearsay rule to allow liberal cross-examination of expert witnesses from respect-

---

5. The following colloquy between counsel for Erdos and the district judge demonstrates agreement that Erdos's movements after his arrival at Dulles were not restrained.

THE COURT: [T]hey claim when he landed he was never in custody, that they did give a summons, just like a parking ticket, to appear on a certain day, but he was not arrested, he was free to go where he wanted to.

MR. McDANIELS: That is correct.

THE COURT: And he did go where he wanted to.

MR. McDANIELS: That is correct.

ed texts.[6] This trend was recognized and approved by the Supreme Court in Reilly v. Pinkus, 338 U.S. 269, 275, 70 S.Ct. 110, 94 L.Ed. 63 (1949), and expressly adopted by this court in Lawrence v. Nutter, 203 F.2d 540 (4th Cir. 1953), at 543:

> We need go no further in the pending case than to hold that the attention of an expert may be called in the course of cross examination to statements in conflict with his testimony contained in relevant scientific works which he recognizes as authoritative. This holding accords . . . with the more liberal view taken in the recent cases . . . .

Before allowing cross-examination from a treatise, however, it must be established that the book is known by the witness and is a generally respected authority in the relevant field. *Reilly, supra*, 338 U.S. at 275, 70 S.Ct. 110; *Lawrence, supra*, 203 F.2d at 542. Since the district court prevented counsel for Erdos from establishing the authenticity and authority of the book, we assume it to be a "learned treatise" for purposes of appeal. We hold it was error to restrict cross-examination from this text. But error alone is not sufficient to justify reversal. Erdos was given every opportunity during his trial to present evidence supporting his defense of insanity. He was allowed ample latitude both in the direct examination of his own numerous witnesses and on cross-examination of the court-appointed psychiatrists. We think the curtailing of the cross-examination of one witness from one particular treatise during a lengthy trial was not error so grave as to require reversal where extensive evidence was properly admitted on the issue in question. Erdos's rights were not substantially affected by this incorrect ruling, and we therefore disregard the error.[7]

Affirmed.

---

6. *See* Proposed Rules of Evidence for United States Courts and Magistrates, R. 803(18), 56 F.R.D. 183, 302 (1972); 6 Wigmore on Evidence §§ 1690–1700 (3d ed. 1940).

7. 28 U.S.C. § 2111 provides:
   On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

   Fed.R.Crim.P. 52(a) provides:
   Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

   *See* Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).