**UNITED STATES of America**

v.

**Darrell Walter HOLMES, Defendant.**

**Criminal Action No. 4:09cr85.**

United States District Court,
E.D. Virginia,
Newport News Division.

March 19, 2010.

Lisa Rae McKeel, Esq., United States Attorney's Office, Newport News, VA, for United States of America.

Larry Mark Dash, Esq., Office of the Federal Public Defender, Norfolk, VA, for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on several motions submitted by Defendant Darrell Holmes ("Holmes" or "Defendant"). Defendant's motions include: (1) Motion to Dismiss for Lack of Venue; (2) Motion to Dismiss for Lack of Jurisdiction; (3) Motion to Dismiss for Violation of the Military Statute of Limitations; and (4) Motion to Suppress Statements. The Government's Motion to Preclude Defendant from Re-litigating his Motion to Suppress or in the Alternative use Transcript at Motion to Suppress is also before the Court. Prior to oral argument, the Court advised counsel that they should be prepared to present live witness testimony at the suppression hearing, in essence denying the Government's motion. The reasons for denial are provided below. The Court heard oral argument and evidence regarding the remaining motions on February 23, 2010. The matter is now ripe for decision, and for reasons set forth below, the Court **DENIES** the parties' respective motions.

## I. FACTUAL BACKGROUND

From 1999 to 2002, Holmes was an active duty member of the United States Air Force stationed at Yokota Air Base, a United States military installation in Japan. Holmes lived on base with his then-wife, also an active duty member of the Air Force, and their children, including Defendant's step-daughter Jane Doe. On occasion, Defendant cared for the couple's children while his wife attended school. It is now alleged that twice between 1999 and 2002, while alone with the children, Defendant sexually assaulted Jane Doe. At the time of the alleged assaults, Jane Doe was between five (5) and eight (8) years old.

The sexual abuse first became known sometime in 2003 when Jane Doe disclosed to her mother that Holmes had molested her during the time the family lived in Japan. When the mother confronted Holmes with the allegation, he denied any such event. Not long thereafter, Jane Doe recanted and denied any improper behavior on the Defendant's part. Apparently, because Jane Doe disavowed her earlier statements, her mother did not report the incident to authorities at that time. Later, in 2006, while Holmes' former wife was stationed at Holloman Air Force Base in New Mexico, Jane Doe again claimed that

Holmes had sexually molested her while in Japan. On December 18, 2006, Defendant's former wife (Jane Doe's mother) contacted the Air Force Office of Special Investigation ("AFOSI") to report the alleged sexual molestation. Jane Doe was interviewed on December 19, 2006, by members of the AFOSI at Holloman Air Force Base, at which time she described the alleged molestation to authorities.

Meanwhile, following his assignment in Japan, Holmes was stationed at Langley Air Force Base in Hampton, Virginia. Then, in January 2007, Holmes was deployed to Qatar. Holmes returned to Hampton in May 2007 following his deployment. His travel from Qatar to Langley Air Force Base took approximately seventy-seven (77) hours and his flight made multiple stops before arriving in Norfolk at approximately 10:00 p.m. on May 20, 2007. Holmes arrived at home at roughly 11:30 p.m. that evening. Around noon the next day, May 21, 2007, Holmes reported to his commander at Langley Air Force Base and was escorted to the AFOSI to be questioned in relation to the sexual molestation allegations made by Jane Doe. Prior to questioning, the investigating AFOSI agents notified Holmes of the allegations against him and advised him of his rights, including his right to remain silent and to have counsel present. After a nearly two-hour interrogation, Holmes made admissions consistent with the allegations of Jane Doe. At the conclusion of the interrogation, Holmes prepared and signed a statement in which he fully admitted to having sexually assaulted his step-daughter.

## II. PROCEDURAL HISTORY

On July 19, 2007, the Air Force ordered a general court-martial of the Defendant for violating Article 125 of the Uniform Code of Military Justice ("UCMJ"). The investigating officer for the military alleged that Holmes had committed sodomy on Jane Doe sometime between January 1, 2000, and December 31, 2000. Defendant sought dismissal of the charge on the grounds that the military statute of limitations barred prosecution. At the time of the Defendant's alleged sexual misconduct, the statute of limitations was five (5) years. In 2003, however, Congress amended the statute of limitations, increasing it to the time when the child reached the age of twenty-five (25). In response to Defendant's motion to dismiss, the investigating officer argued that the recently-amended statute of limitations should be applied retroactively, thus permitting the military to prosecute Holmes for an offense that allegedly occurred more than five (5) years earlier, in 2000.

Sometime thereafter, the military judge learned that the Court of Appeals for the Armed Forces ("CAAF") would be hearing argument on the question of whether the amendments increasing the statute of limitations for crimes of child sexual assault should be applied retroactively. Accordingly, the military judge held the court-martial in abeyance pending a decision from the CAAF. On February 26, 2008, in *United States v. Lopez de Victoria*, the CAAF held that the amendments to the statute of limitations do not apply retroactively. 66 M.J. 67, *reh'g denied*, 66 M.J. 369 (C.A.A.F.2008). Thus, if an individual is charged in a military court-martial with having committed an indecent act with a child prior to the 2003 amendments taking effect, the five (5) year statute of limitations would continue to apply. Following the CAAF's decision, Defendant filed a renewed motion to dismiss on March 12, 2008, which again argued that the statute of limitations had expired and that prosecution was barred. On March 13, 2008, the Convening Authority dismissed the charge against Holmes without prejudice. The dismissal letter was later amended on March 24, 2008, to clarify that the charges had been *"withdrawn* and dismissed."

Nothing in the letter expressly explained why the Convening Authority had chosen to voluntarily dismiss Holmes' court-martial.

On April 15, 2008, the Defendant was indicted ("First Indictment") by a federal grand jury in Newport News on two counts of aggravated sexual abuse of a child, in violation of 18 U.S.C. § § 2241(c) and 7. *United States v. Holmes*, No. 4:08–cr–34 (E.D.Va. filed April 15, 2008). Defendant was arrested on the First Indictment in the State of Virginia. Not long thereafter, the Government moved to dismiss the First Indictment, ostensibly upon realizing that it was precluded from prosecuting the Defendant because he was still a member of the armed forces, and thus subject to the UCMJ. Accordingly, on May 21, 2008, the First Indictment was dismissed by order of another judge of this Court, though nothing in the dismissal order explicitly explained the reasons for dismissal.

On October 24, 2008, the Defendant was discharged from the Air Force based on the allegations made by Jane Doe. On November 12, 2008, a federal grand jury indicted the Defendant for a second time ("Second Indictment"). *United States v. Holmes*, No. 4:08–cr–134 (E.D. Va. filed Nov. 12, 2008). The Second Indictment again charged Holmes with two counts of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 2241(c) and 7. Defendant subsequently was arrested in connection with the Second Indictment in Greenville, North Carolina, on November 17, 2008. On December 11, 2008, the U.S. Marshals Service transferred Holmes to the Eastern District of Virginia for prosecution.

On March 2, 2009, Defendant filed several motions, including a motion to dismiss for lack of venue and a motion to suppress statements made to AFOSI agents during his interrogation. On May 22, 2009, Defendant's motions were denied by another judge of this Court. *United States v. Holmes*, 618 F.Supp.2d 529 (E.D.Va.2009). Thereafter, Holmes entered a conditional plea of guilty and sentencing was scheduled for August 10, 2009. Prior to sentencing, and upon discovery of new information, the judge hearing the matter became concerned about possible res judicata, duplicity, and venue issues that might preclude prosecution. On November 24, 2009, after additional briefing by the parties, the Court from the bench, and by written opinion on December 4, 2009, vacated its earlier decision denying Defendant's motions and granted Defendant's motion to dismiss for lack of venue. *United States v. Holmes*, 672 F.Supp.2d 739 (E.D.Va.2009).

After the Court dismissed the Second Indictment, Holmes was returned to the U.S. Marshals holding cell on the first floor of the U.S. District Courthouse in Norfolk, Virginia, to be processed for release. While Holmes was still in custody, Federal Bureau of Investigation ("FBI") Agent Kim Wright ("Agent Wright") rearrested the Defendant based on probable cause to believe Holmes had sexually assaulted Jane Doe. Agent Wright detained the Defendant until a Magistrate Judge could hear argument on the Government's request for detention. Later that same day, Defendant was brought before the Court. The Court orally granted the Government's request to detain Holmes, and later issued a written order of detention on December 2, 2009. On December 7, 2009, Defendant was indicted by a federal grand jury for a third time ("Third Indictment") and the case was assigned to the undersigned. The Third Indictment once again charged Holmes with two counts of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 2241(c) and 7.

On January 1, 2010, the Defendant filed the following motions in this Court: (1)

Motion to Dismiss for Lack of Venue; (2) Motion to Dismiss for Lack of Jurisdiction; (3) Motion to Dismiss for Violation of the Military Statute of Limitations; and (4) Motion to Suppress Statement. The Government responded in a consolidated brief filed on January 28, 2010, and Defendant filed his reply to the Government's submission on February 9, 2010. On February 16, 2010, the Government also submitted a Motion to Preclude Defendant from Re-litigating his Motion to Suppress, which urged the Court to adopt the prior suppression ruling involving the Second Indictment, or to use the transcript of the earlier suppression proceeding as an alternative to requiring witnesses to testify. In his February 19, 2010, response to the Government's motion, Defendant opposed the adoption of the prior suppression ruling, as well as the use of the transcript in lieu of live testimony. The Court thereafter notified the parties that it would not rely on the transcripts from the earlier motion hearing and that a new suppression hearing would be held. Accordingly, the Court heard evidence and oral argument on each of the Defendant's motions on February 23, 2010.

## III. DISCUSSION

Defendant asks the Court to dismiss the Third Indictment for three reasons: (1) venue is improper in the Eastern District of Virginia; (2) the Court lacks jurisdiction to try an American citizen for offenses that occurred outside the United States; and (3) the military statute of limitations and the doctrine of collateral estoppel bar prosecution. Defendant also seeks suppression of a confession he made to authorities the day after returning to Langley Air Force Base following his de-

ployment to Qatar. Finally, in relation to the suppression motion, the Government seeks to prohibit Defendant from re-litigating the suppression motion or, in the alternative, use the transcript from the evidentiary hearing on the Second Indictment. After careful consideration of the parties' written submissions, oral arguments, and the evidence, the Court finds that the Defendant's and Government's respective motions must be denied.

### A. Motion to Dismiss for Lack of Venue

Defendant first moves for dismissal on the ground that venue in the Eastern District of Virginia is improper. Analysis of this motion begins with the Constitution of the United States.

#### i. relevant law

The Constitution requires that "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. This guarantee is reinforced by the Sixth Amendment's declaration that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see also* Fed.R.Crim.P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). As a result, venue is often only proper in the district in which the crime was committed. However, "when [a crime is] not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." U.S. Const. art. III, § 2, cl. 3. Pursuant to this authority, Congress has provided in 18 U.S.C. § 3238[1] that when a crime is

---

**1.** 18 U.S.C. § 3238 provides: "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offend-

committed outside of "any particular State or district," venue will be deemed appropriate in the district in which the offender "is arrested or is first brought." 18 U.S.C. § 3238.

The leading Fourth Circuit opinion interpreting the provisions of 18 U.S.C. § 3238 is *United States v. Erdos,* 474 F.2d 157 (4th Cir.), *cert. denied,* 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973). In *Erdos,* the government indicted an embassy employee for manslaughter following his killing of a fellow employee at the United States embassy in the Republic of Equatorial Guinea. *Id.* at 158. Following the incident, the defendant voluntarily boarded a commercial flight to return to the United States. *Id.* at 161. Prior to arriving at Dulles Airport in Virginia, the flight carrying the defendant made an unexpected stop in Massachusetts. *Id.* Upon finally landing in Virginia, the defendant was served with a complaint and summons that required him to appear in the District Court for the Eastern District of Virginia. *Id.* The defendant was also later arrested in Alexandria, Virginia. *Id.*

The defendant challenged the propriety of venue in the Eastern District of Virginia, arguing that, pursuant to § 3238, he could only be prosecuted in the District of Massachusetts because it represented the district to which he was "first brought." *Id.* The Fourth Circuit rejected the defendant's argument, holding instead that the place where an offender is "arrested or is first brought" under § 3238 simply means the district in which the offender is first "arrested." *Id.* at 160. The court explained that § 3238 creates venue in "that district within the United States where the offender is first restrained of his liberty in connection with the offense charged." *Id.*

Accordingly, the Fourth Circuit held that because the defendant voluntarily boarded the airplane and was not restrained until he arrived in the Eastern District of Virginia, venue was proper in the Eastern District of Virginia and not the District of Massachusetts. *Id.* at 161.

In another leading case, the Second Circuit has similarly found that § 3238 creates venue in the district in which the offender is first restrained on the offense charged. *United States v. Provoo,* 215 F.2d 531, 537–38 (2d Cir.1954). In *Provoo,* the defendant, a soldier, was held in custody in Maryland by the Army on charges of sodomy. *Id.* After learning that the Department of Justice wished to charge the defendant with treason, the Army delayed its court-martial, but continued to detain the defendant. *Id.* After four months, the Army dismissed the sodomy charges and brought the defendant to New York, where he was discharged from the military and transferred into the custody of the FBI, who ultimately arrested the defendant for treason. *Id.* The defendant challenged the propriety of venue in the Southern District of New York. *Id.* The government, in turn, explained that venue existed in the Southern District of New York because it was the site of defendant's first arrest in connection with the treason charges. *Id.* The Second Circuit disagreed, holding that it was evident that the Army had restrained the defendant for purposes of later bringing him to New York to be prosecuted for treason by the Department of Justice. *Id.* The court found that the defendant's continued restraint in Maryland constituted his first "arrest" for purposes of § 3238, and, as a result, that venue properly laid in the District of Maryland. *Id.*

ers are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or

more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia."

### ii. government's argument in support of venue in the Eastern District of Virginia

 The government bears the burden of proving, by a preponderance of the evidence, that venue exists in the district in which the charges have been filed. *United States v. Ebersole,* 411 F.3d 517, 524 (4th Cir.2005). In the instant case, the Government argues that venue in the Eastern District of Virginia is proper because the Defendant was first restrained, for purposes of § 3238, on the offenses charged in the Third Indictment when he was arrested in the State of Virginia, in connection with the First Indictment.

The Government claims that the Defendant's 2008 arrest in the State of Virginia, in connection with the First Indictment, establishes venue in this district for purposes of the Third Indictment because the First Indictment and the Third Indictment charge identical offenses stemming from the same set of facts. The Defendant attempts to rebut the Government's argument by claiming that his arrest on the First Indictment cannot support venue in the Eastern District of Virginia because he was a member of the military at that time, and, consequently, the federal courts were without jurisdiction to authorize his arrest.

The Court is unpersuaded by Defendant's argument. Holmes is charged with sexually assaulting his step-daughter while stationed at Yokota Air Base in Japan. Because Yokota Air Base is a United States military installation clearly outside the jurisdiction of any state or district, venue is governed by the provisions of § 3238. Neither party contends otherwise. As explained above, under § 3238, venue is determined by identifying the district in which the Defendant was first restrained on the charges now alleged in the Third Indictment. Nothing in the statute suggests that the first "arrest" requirement is indictment-specific. That is to say, nothing in § 3238 suggests that when an indictment is filed, dismissed, and then re-filed against a defendant, the arrest on the first indictment is not controlling for purposes of assessing venue. Indeed, the statute is phrased in terms of the *offense* committed, stating that "[t]he trial of all *offenses* begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender ... is arrested or is first brought." 18 U.S.C. § 3238 (emphasis added). This language indicates that venue is proper in the district where the defendant is first restrained in connection with the underlying *offense,* rather than any particular *indictment.*

This conclusion can also be gleaned from the case law. In *Provoo,* for example, the Second Circuit focused on the location in which the defendant was first restrained, irrespective of whether or where an indictment may have been filed. *Provoo,* 215 F.2d at 538; *see also Erdos,* 474 F.2d at 160 (holding that "venue is in the district ... where the defendant is first restrained of his liberty *in connection with the offense charged.*") (emphasis added). In fact, in that case, the defendant was not indicted on charges of treason until he arrived in the Southern District of New York, yet the court nevertheless found that venue did not exist in that district. *Provoo,* 215 F.2d at 538. If § 3238 is indictment-specific then the defendant's arrest in New York on the indictment charging treason would have controlled and venue would have existed in the Southern District of New York. *Id.* Instead, the court read § 3238 to deem venue to exist in the district where a defendant is first restrained with respect to the offense charged. *Id.* Accordingly, because the defendant was detained in Maryland in anticipation of the Department of Justice bringing treason charges, he was essentially

being detained on the treason charges at the request of the Department of Justice pending indictment. Hence, venue was proper only in the District of Maryland, where he was first detained on the anticipated treason charge. *Id.*

The Court therefore concludes that § 3238 deems venue appropriate in the district in which a defendant is first restrained in connection with the offense charged, regardless of indictment. In the instant case, venue attached when Holmes was first restrained on the sexual assault charges he now faces in the Third Indictment. Because the Defendant was arrested in the Eastern District of Virginia on the First Indictment for the same offenses set forth in the Third Indictment, venue exists in this district.

Defendant argues that the arrest on the First Indictment should not support venue under § 3238 because the federal courts had no jurisdiction to authorize his arrest as he was a member of the military. In essence, Defendant asserts that his arrest in connection with the First Indictment should be considered a nullity and, accordingly, have no bearing on determining venue pursuant to § 3238. Although the Defendant's argument has some appeal, the Court observes that the May 21, 2008 order dismissing the First Indictment does not indicate why the Government requested, and the Court granted, dismissal.

More importantly, even if the Government stipulates that the First Indictment was dismissed on jurisdictional grounds, nothing in § 3238 suggests that an arrest that is jurisdictionally defective does not still control for purposes of a determination of venue. In § 3238, Congress sought to solve the problem of *where* to try a case involving a crime occurring outside the United States. This was not an issue of jurisdiction, it was an issue of venue, i.e. *where* to try the case. Congress simply, and to some extent arbitrarily, deemed

venue to be proper in the district where a defendant, charged with an offense occurring outside of the United States, "is arrested or is first brought." 18 U.S.C § 3238. This Court must read the plain language of the statute to give effect to Congressional intent. If Congress had wished to open up a pandora's box of legal questions with respect to determining venue for an offense occurring abroad, it could have easily included language in § 3238 indicating that an arrest, to be controlling, must be indictment-specific, or that the arrest must be valid or without jurisdictional defect. Such questions would, however, mix venue and jurisdiction principles and significantly cloud what is otherwise a relatively straightforward method of determining venue. It is unnecessary, and improper, for this Court to read such complexities into a statute that is intended to make identification of venue straightforward and definitive. Congress has selected a clear method for determining venue that this Court is required to apply: the district in which the defendant is first restrained on the offense charged.

Accordingly, the Defendant's arrest on the First Indictment controls for purposes of determining venue under § 3238, and venue is therefore appropriate in the Eastern District of Virginia. For this reason, the Defendant's claim, that venue in the Eastern District of Virginia is improper, must fail and the Motion to Dismiss for Lack of Venue is denied.

## B. Lack of Jurisdiction

Defendant next moves for dismissal of the Third Indictment on the grounds that this Court lacks jurisdiction to hear the Government's claims as they have been alleged. Specifically, Defendant contends that the statutes cited in the Third Indictment, namely 18 U.S.C. §§ 2241(c) and 7, do not authorize the Government to prosecute Americans for crimes committed

abroad. Defendant further asserts that because he was an active duty member of the military during the time period that the sexual abuse allegedly occurred, the Government is required to bring this case under the Military Extraterritorial Jurisdiction Act ("MEJA"), which it has failed to do. Finally, the Defendant also claims that the Status of Forces Agreement ("SOFA") entered into between the United States and Japan permits only the Government of Japan or the United States military to prosecute crimes occurring on Yokota Air Base.

### 1. sections 2241(c) and 7(3)

The Third Indictment charges the defendant with two counts in violation of 18 U.S.C. §§ 2241(c) and 7. Section 2241(c) provides, in part, "[w]hoever ... in the special maritime and territorial jurisdiction of the United States ... knowingly engages in a sexual act with another person who has not attained the age of 12 years ... shall be fined under this title and imprisoned for not less than 30 years or for life." 18 U.S.C. § 2241(c). Section 7(3) [2] defines the term "special maritime and territorial jurisdiction of the United States" to include, among other places, military bases. See 18 U.S.C. § 7(3) (defining territorial jurisdiction as land reserved or acquired for "erection of a fort, magazine, arsenal, dockyard, or other needful building").

Defendant argues that § 7(3) does not create jurisdiction to prosecute American citizens for crimes they committed outside of the United States. In support of this position, Defendant relies on United States v. Gatlin, in which the Second Circuit Court of Appeals held that Congress intended § 7(3) "to apply only to lands within the territorial boundaries of the United States." 216 F.3d 207, 216 (2d Cir.2000). In Gatlin, the court concluded that the government could not prosecute an American civilian, under § 7(3), for engaging in sexual acts with a minor while stationed in Bosnia. Id. Defendant thus similarly urges this Court to interpret § 7(3) as granting jurisdiction only for crimes occurring within the territorial boundaries of the United States. Under such an interpretation, § 7(3) would not authorize the Government to prosecute the Defendant for crimes occurring on Yokota Air Base in Japan.

The Fourth Circuit Court of Appeals has specifically expressed a contrary interpretation of § 7(3) that is controlling in this matter. In United States v. Erdos, the Fourth Circuit held that § 7(3) represents "a proper grant of special territorial jurisdiction" that authorizes the Government to prosecute Americans who commit crimes outside of the United States so long as the land is "reserved or acquired for the use of the United States, and under its exclusive or concurrent jurisdiction." Erdos, 474 F.2d at 160; see also United States v. Corey, 232 F.3d 1166 (9th Cir.2000) (finding that § 7(3) authorizes the Government to prosecute a defendant for performing sexual acts on his step-daughter while stationed at Yokota Air Base in Japan). As a result, there can be no doubt that § 7(3) must be interpreted to provide jurisdiction for crimes committed beyond the geographical boundaries of the United States.

As stated previously, Holmes is alleged to have sexually assaulted his step-daughter at Yokota Air Base in Japan. The statute provides, and the case law

---

2. 18 U.S.C. § 7(3) defines "the special maritime and territorial jurisdiction of the United States" as "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

teaches, that in order for § 7(3) to apply, the foreign location must be "reserved or acquired· for the use of the United States and under its exclusive or concurrent jurisdiction." *Erdos,* 474 F.2d at 160. The question then becomes whether Yokota Air Base in Japan constitutes land (1) "reserved or acquired for the use of the United States" and (2) "under its exclusive or concurrent jurisdiction." *Id.* This ·issue was squarely, and persuasively, addressed under nearly identical circumstances in the Ninth Circuit's decision in *Corey,* in which the court found that the United States had jurisdiction to prosecute a defendant for sexually abusing a minor at Yokota Air Base. 232 F.3d at 1176–1183.

First, Yokota Air Base is clearly a military installation located outside of the territorial boundaries of the United States that constitutes property acquired for the use of the United States. *Corey,* 232 F.3d at 1177 ("In negotiating Japan's return to self-government, the Japanese government agreed that the United States would retain control over certain areas of the country, including the territory on which [Yokota Air Base] is located.") (citing Preliminary Working Group Under the Exchange of Notes between the Governments of the United States and Japan on 28 February 1952, Minutes of the Eighth meeting, at 20 (Apr. 3, 1952)).

Second, it is equally clear that, under the SOFA between the United States and Japan, the United States enjoys concurrent jurisdiction to regulate the facilities and areas on the Yokota Air Base. *Corey,* 232 F.3d at 1181 (finding that the SOFA with Japan "leave[s] the United States with substantially greater authority to regulate conduct than the host country"). As the Fourth Circuit noted in *Erdos,* and the Ninth Circuit explained in *Corey,* whether such jurisdiction exists is assessed by examining whether the United States enjoys "practical usage and dominion" over the

foreign land in question. *Id.* at 1178 (citing *Erdos,* 474 F.2d at 159). "Under this test, the court considers whether the·United-ed States enjoys such control over the area that the law should constructively regard it as United States territory." *Id.* The SOFA with Japan grants the United States broad legislative authority by providing that "[w]ithin the facilities and areas, the United States may take all the measures necessary for their establishment, operation, safeguarding and control." *Id.* (quoting Agreement Under Article VI of the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, Regarding Facilities and Areas and the Status of United States Armed Forces in Japan (SOFA), art. III, Jan. 19, 1960, 11 U.S.T. 1652).

Therefore it is clear that Yokota Air Base constitutes land "reserved or acquired for the use of the United States and under its exclusive or concurrent jurisdiction." *Erdos,* 474 F.2d at 160. Accordingly, § 7(3) does create jurisdiction for the Government to prosecute the Defendant in federal court on charges of aggravated sexual abuse of a child that allegedly took place on Yokota Air Base in Japan.

### ii. military extraterritorial jurisdiction act

Defendant further contends that any charges against him must be brought under MEJA, codified as 18 U.S.C. § 3261, rather than §§ 2241 and 7(3). MEJA provides that members of the Armed Forces who commit a felony in the "special maritime and territorial jurisdiction of the United States ... while employed by or accompanying the Armed Forces outside of the United States; or while a member of the Armed Forces subject to [the UCMJ]" will be punished in accordance with the statute criminalizing the offense. 18 U.S.C. § 3261. Defendant asserts that because he was a member of the military

during the time period that the alleged offense occurred, he can therefore only be prosecuted pursuant to MEJA.

■ Defendant's argument is misplaced. Simply put, MEJA did not go into effect until November 22, 2000, and prior to that time such crimes would be prosecuted under extraterritorial jurisdiction statutes, such as 18 U.S.C. §§ 2241 and 7. 18 U.S.C. § 3261. Although the Government cannot provide the exact date on which the alleged sexual misconduct occurred, it has been able to narrow the time frame to between 1999 and 2002. As a result, it is possible that the alleged sexual assault occurred prior to MEJA's enactment. Thus, as applying MEJA in this context would violate the constitutional protection against ex post facto laws, the Court disagrees with Defendant's assertion that these charges must be brought under MEJA. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) ("To fall within the ex post facto prohibition... the law must be retrospective, that is, it must apply to events occurring before its enactment...."); *United States v. Morton,* 314 F.Supp.2d. 509, 514 n. 8 (D.Md.2004) (noting that MEJA does not apply retroactively to crimes committed before the statute's enactment).

Accordingly, MEJA is inapplicable in the instant case, and the Government has appropriately brought charges under 18 U.S.C §§ 2241(c) and 7.

### iii. sofa between United States and Japan

Finally, Defendant argues that the SOFA entered into between Japan and the United States on January 19, 1960, provides that the United States military and the Japanese authorities will have concurrent jurisdiction over any offense committed by U.S. military personnel stationed in Japan. More importantly, Defendant contends that the jurisdictional authority held by the United States military and Japanese government is exclusive, precluding jurisdiction by United States non-military courts. Therefore, Defendant claims the federal courts do not have the authority to exercise jurisdiction over the instant case.

■ Importantly, the SOFA between the United States and Japan only "delimit[s] the respective spheres of jurisdiction *over the territory reserved* for the use of American soldiers and diplomats." *Corey,* 232 F.3d at 1181 (relying on SOFA, *supra,* art. III, XVII) (emphasis added). Despite Defendant's contentions to the contrary, nothing in the SOFA therefore limits the jurisdictional authority of non-military United States courts seeking to try civilian defendants in the United States.

■ Furthermore, the instant case is not one in which the United States is attempting to exercise criminal jurisdiction *within* the Japanese "territory reserved for the use of American soldiers and diplomats." *Id.* Instead, the Government is prosecuting the Defendant, now a civilian, in the Eastern District of Virginia for an offense allegedly committed while he was abroad. Through passage of 18 U.S.C §§ 2241 and 7, Congress has expressly authorized the Government to prosecute individuals, such as the Defendant, in federal court, for crimes committed while on foreign soil controlled by the United States. *See Corey,* 232 F.3d at 1183 ("[T]he United States exercises concurrent, and indeed primary, jurisdiction over the actions of United States nationals on ... the Yokota Air Force Base.... This conclusion arises out of the plain meaning of subsection 7(3), the relevant international agreements, and the practical realties of the situation.").

For these reasons, the Court finds Defendant's arguments for dismissal based on lack of jurisdiction to be unpersuasive. Accordingly, the Defendant's Motion to Dismiss for Lack of Jurisdiction is denied.

### C. Violation of Military Statute of Limitations

Defendant next asks this Court to dismiss the Third Indictment on the grounds that the doctrine of collateral estoppel bars prosecution. More specifically, Defendant contends that because the charges contained in the Third Indictment are identical to those previously brought before a military court-martial, and because the charges before the court-martial were ultimately dismissed, the Government cannot now re-litigate the matter in federal court. Significantly, the Defendant claims that the earlier charges were dismissed because the statute of limitations had expired, and thus on substantive grounds.

■ The Constitution's Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This guarantee protects defendants from "being subject to successive prosecutions for the 'same offense.'" *United States v. Ragins*, 840 F.2d 1184, 1187 (4th Cir.1988). Offenses are not identical under the "same offense" test when "each provision [i.e., each charge] requires *proof of a fact* which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The *Blockburger* test thus "focuses on the formal elements of the two crimes." *Ragins*, 840 F.2d at 1188.

■ In addition to the Double Jeopardy Clause, the traditional civil doctrine of collateral estoppel has been defensively applied as a shield in the criminal context to bar repeat prosecution. The doctrine of collateral estoppel, whether applied to a civil or criminal matter, provides that "[w]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *see*

*also United States v. Oppenheimer*, 242 U.S. 85, 87, 37 S.Ct. 68, 61 L.Ed. 161 (1916) ("It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt.") (Holmes, J.,). Thus, while "Double Jeopardy is a constitutional bar ... to retrial for the same offense," collateral estoppel, in the context of a criminal case, bars "relitigation of adjudicated issues whether they emerge in the trials for the same or distinct offenses." *United States v. Nash*, 447 F.2d 1382, 1384 (4th Cir. 1971).

■ The collateral estoppel doctrine "is not to be applied with a hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *United States v. Benkahla*, 530 F.3d 300, 307 (4th Cir.2008) (quoting *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189). Courts must thus employ a practical approach that requires "closely examining the record of both trials to discern whether an 'issue of ultimate fact' resolved in the first was indeed reopened in the second." *Id.* (quoting *Ashe*, 397 U.S. at 443, 90 S.Ct. 1189). The Fourth Circuit has concluded that this inquiry turns on whether "an identical issue was actually and necessarily decided in the first trial, after a full and fair opportunity to litigate and a final and valid judgment." *Id.* (quoting *United States v. Fiel*, 35 F.3d 997, 1006 (4th Cir. 1994) (internal quotations omitted)). The Fourth Circuit has therefore articulated five factors that should be considered when determining whether an issue is precluded from reconsideration under the doctrine of collateral estoppel:

(1) whether the issue in question is identical to the previous issue, (2) whether it was actually determined in the prior adjudication, (3) whether it was necessarily decided in that proceeding,

(4) whether the resulting judgment settling the issue was final and valid, and (5) whether the parties had a full and fair opportunity to litigate the issue in the prior proceedings.

*Fiel,* 35 F.3d at 1006.

 As an initial matter, Defendant does not appear to argue that the charges contained in the Third Indictment run afoul of the *Blockburger* "same offense" test, and thus the Double Jeopardy Clause. Indeed, the military charged the Defendant with violating Article 125 (Sodomy) of the UCMJ, while the Third Indictment charges the Defendant with Aggravated Sexual Abuse in violation of 18 U.S.C. § 2241(c). A quick glance at the statutes shows that they each plainly contain at least one different element. For instance, in order to be convicted of violating Article 125 of the UCMJ, the defendant must "be subject to [the UCMJ]" and engage in "unnatural carnal copulation with another person of the same or opposite sex or with an animal." Article 125, UCMJ, 10 U.S.C. § 925. Section 2241(c) does not contain these elements. 18 U.S.C. § 2241(c). In addition, § 2241(c) requires, among other things, that the defendant "knowingly engages in a sexual act with another person who has not attained the age of 12 years," and that such misconduct occurs in a "special maritime and territorial jurisdiction of the United States." *Id.* Article 125 does not contain these elements. Article 125, UCMJ, 10 U.S.C. § 925. Therefore, the offenses are considered different and double jeopardy is not implicated under the *Blockburger* "same offense" test.

 Defendant argues instead that the doctrine of collateral estoppel, as it is applied in the criminal context, precludes prosecution. Specifically, Defendant contends that the Convening Authority dismissed the charges presented at the court-martial because, following the CAAF's decision in *Lopez de Victoria,* it was clear that the military statute of limitations had expired. Defendant claims that because the Convening Authority dismissed the charges based on the expiration of the statute of limitations, a substantive ground, the dismissal letter acts as a final judgment that forecloses future prosecution. Moreover, Defendant adds, such a dismissal is impermissible because it amounts to a manipulation of the judicial process in order to obtain a preconceived result, by allowing the Government to now re-file charges for the same conduct in federal court, where the statute of limitations is significantly longer. Finally, Defendant argues that at a previous hearing the Government has conceded that dismissal was sought due to the expiration of the military statute of limitations.

Although the Defendant's argument has some appeal, there is very little this Court can do given the dismissal letter. First, as the Government points out, nothing in the dismissal letter issued by the Convening Authority indicates that the charges were dismissed based on the statute of limitations having expired. Instead, the dismissal letter merely states the charges were "withdrawn and dismissed" without prejudice. There is simply no way for this court to know why the Convening Authority dismissed the charges pending against the Defendant. While the Defendant has pointed out reasons that would be questionable grounds for dismissal, there also exist legitimate grounds for ordering a dismissal. For example, it may have been that the military wanted to consider appealing the *Lopez de Victoria* decision. Because this Court is not in a position to go back and determine what the Convening Authority had in mind when it dismissed the charges, it is impossible now for the Court to find that dismissal was premised on a statute of limitations violation.

More importantly, the factors articulated by the Fourth Circuit, as relevant to determining whether collateral estoppel applies, are not all present. First, there is no issue in the instant action identical to an issue before the military court-martial. That is to say, whether or not the military statute of limitations had expired is of no consequence in this case because the Defendant is charged under a separate and distinct federal statute for which the statute of limitations has not expired. To the extent that Defendant seeks to preclude the instant litigation by asserting that a similar charge was brought by the military, and subsequently dismissed on substantive grounds, that argument is one properly analyzed under the *Blockburger* "same offense" test. Under *Blockburger*, if the offenses charged by the military and those now presented in the Third Indictment are the same, then a dismissal on statute of limitations grounds would indeed preclude further prosecution by the United States. *See Oppenheimer*, 242 U.S. at 87, 37 S.Ct. 68 ("A plea of the statute of limitations is a plea to the merits ...."). However, as discussed above, double jeopardy is not implicated in this case because the offenses are distinct.

Second, there simply is no judgment by a court or tribunal for collateral estoppel to attach to in this case. *See United States v. MacDonald*, 585 F.2d 1211, 1212 (4th Cir.1978) ("[B]ecause no final judgment of a tribunal having jurisdiction to try [the defendant] has determined an issue of ultimate fact, the prosecution pending in the district court is not barred by ... collateral estoppel."). Although the military judge may have decided to dismiss the court-martial against the Defendant if the issue was before him, that is not what happened. The Convening Authority, for whatever reason, decided instead to withdraw and dismiss the charges prior to an official and final judgment. Therefore, no final judgment was issued by a court or tribunal.

For these reasons, the Court is unable to conclude that the doctrine of collateral estoppel bars the Government from prosecuting the Defendant on charges similar to those brought before, and ultimately dismissed by, a military court-martial. Therefore the Court must deny the Defendant's Motion to Dismiss for Violation of the Military Statute of Limitations.

### D. Motion to Suppress

Lastly, Defendant moves the Court to suppress incriminating statements he made during an interrogation conducted by AFOSI agents regarding the allegations of Jane Doe. Defendant contends that these statements were involuntary because: (1) they were coerced through the use of direct and implied promises, and (2) they were made while he was in an impaired state following his seventy-seven (77) hour flight from Qatar. Before delving into the merits of the Defendant's motion, however, the Court must briefly address the Government's Motion to Preclude Defendant from Re-litigating his Motion to Suppress or in the Alternative Use Transcript. As stated above, the Court advised the parties before the suppression hearing that they should present live testimony, in essence denying the Government's motion.

#### i. motion to use transcript in lieu of testimony

While this matter was before the Court on the Second Indictment, Defendant filed a motion to suppress. At that time, another judge of this Court heard testimony from witnesses presented by the Government and heard oral argument on the motion. The Court subsequently denied the Defendant's motion. In anticipation of a hearing on an identical suppression motion filed by the Defendant in connection with the Third Indictment, the Government

filed a motion requesting that this Court prohibit the Defendant from re-litigating the underlying issues, or, in the alternative, asking the Court to rely on the transcript from the earlier hearing. In response, the Defendant argued that this Court should require the Government to again produce the witnesses that testified at the original suppression hearing. Defendant maintains that the Court should deny the Government's motion because he "was not permitted to fully develop, through cross examination, the facts and circumstances of the interview by the special agents," and because he "believes that this Court should have the opportunity to observe the witnesses as well as hear the answers to questions posed to those witnesses."

As alluded to in the above discussion of defensive criminal collateral estoppel in the double jeopardy context, cases discussing the application of collateral estoppel in criminal matters turn on the specific facts and procedural context before the courts, including whether it is sought to be used offensively or defensively. For example, in a well-reasoned opinion from the Third Circuit Court of Appeals, the court held that the prosecution cannot offensively use collateral estoppel in criminal cases where such application would deprive a defendant of his right to a jury trial. *United States v. Pelullo*, 14 F.3d 881, 889–898 (3d Cir. 1994). The Eleventh Circuit has held that the "government may not collaterally estop a criminal defendant from relitigating an issue decided against the defendant in a different court in a prior proceeding." *United States v. Harnage*, 976 F.2d 633, 636 (11th Cir.1992). However, the Ninth Circuit has repeatedly permitted the government to offensively use collateral estoppel against a criminal defendant. *See, e.g., United States v. Thoresen*, 428 F.2d 654, 667 (9th Cir.1970). In addition, many state courts also permit the prosecution to use offensive collateral estoppel against a

criminal defendant in the suppression context. *See, e.g., State of Maine v. Hider*, 715 A.2d 942, 945 (Maine 1998) (citing Richard B. Kennelly, Jr., *Precluding the Accused: Offensive Collateral Estoppel in Criminal Cases*, 80 Va. L.Rev. 1379, 1386 (1994) ("Invoking collateral estoppel against the accused is more easily justified regarding suppression motions than regarding a substantive element of the offense.")).

The parties have cited no cases from the Fourth Circuit addressing this issue. However, as was mentioned in the discussion of collateral estoppel above, the Fourth Circuit has addressed the use of defensive collateral estoppel by criminal defendants seeking to preclude re-litigation of various issues. *Benkahla*, 530 F.3d at 307; *Fiel*, 35 F.3d at 1006. The Fourth Circuit has described its approach to application of collateral estoppel in this arena as being done "with realism and rationality" rather than "with the hypertechnical and archaic approach of a 19th century pleading book." *Benkahla*, 530 F.3d at 307. In turn, courts must look to whether the two trials at issue involved an identical issue necessarily adjudicated in the first, whether an identical issue was actually and necessarily decided in the first trial, after a full and fair opportunity to litigate and a final and valid judgment, and whether certain facts were necessarily determined in the first trial that constituted ultimate issues in the second. *Id.* Therefore, the factors that the Fourth Circuit examines in considering defensive criminal collateral estoppel appear to be similar to the factors other courts examine in determining whether to apply offensive criminal collateral estoppel to preclude a defendant from re-litigating a suppression ruling. *See, e.g., Hider*, 715 A.2d at 946.

▮▮▮ Even if offensive criminal collateral estoppel were available to the Govern-

ment in this circuit, here all the required factors are not present, as the Government cannot show that there was a final and valid judgment after a full and fair opportunity to litigate, as the indictment on which the court denied the first suppression motion was later dismissed. While it is true that the Defendant fully litigated the suppression issue before the District Court, the subsequent granting of the motion to dismiss on venue grounds meant that the suppression ruling, which could not be appealed, did not result in a final and valid judgment. *See Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 787 (9th Cir.2001) (finding that "collateral estoppel does not apply when the ruling in issue was not subject to appeal" because it was a non-appealable interlocutory order).

■ Alternatively, the Government sought to use the transcripts of the prior suppression hearing in support of its opposition to the Defendant's suppression motion. However, the Government has offered no evidentiary justification for doing so. While it would be possible for the parties to stipulate to the use of such transcript, the Defendant opposes its use, and the Court has no basis on which to permit admission of such transcripts. *See Harnage*, 976 F.2d at 636 n. 4 (permitting parties to agree to use transcript of prior proceedings when evaluating suppression motion with supplementation by live witnesses).

For these reasons, the Government's motion to preclude re-litigation of Defendant's motion to suppress, as well as the Government's alternative motion to use the prior transcript at the suppression motion, are denied.

### ii. suppression

■ Turning to Defendant's Motion to Suppress Statements, the Court first notes that "[a] statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir.1997) (en banc). Statements are involuntary under the Due Process Clause if they were "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (citing *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976)) (internal quotations omitted) (alterations in original). In assessing whether a statement is voluntary, a court must examine the "totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir.1987) (internal quotations omitted). The test for voluntariness is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired.'" *Id.* at 1071–72.

■ While "[t]he requirement that *Miranda* warnings be given does not … dispense with the voluntariness inquiry," statements made following a *Miranda* warning will "rare[ly]" be deemed involuntary. *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Furthermore, in examining the voluntariness of a defendant's statements, a finding of involuntariness requires a showing of some coercive conduct on the government's part. *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Still, for a statement to be voluntary, an interrogation need not be entirely void of intimidation. *Braxton*, 112 F.3d at 780–82. For example, "[t]ruthful statements about the defendant's predicament are not the type of coercion that threatens to render a statement involuntary." *Id.* In addition, a defendant's weakened mental state alone does not supply a basis for suppression

due to involuntariness. *See United States v. Cristobal,* 293 F.3d 134, 140–41 (4th Cir.2002) (upholding admission of confession day after the defendant had been shot multiple times, undergone emergency surgery, and received significant medication).

With these parameters in mind, the Court turns to Defendant's assertions. Defendant now argues that the statement he made to agents with the AFOSI during his interrogation were involuntary and should be suppressed. Defendant offers two grounds for why his statements were involuntary: (1) because his will was overborne and his capacity for self-determination critically impaired due to jet lag and the manner of the interrogation, and (2) because his statements were extracted by direct and implied promises that suggested that a confession would make things easier on the victim in the future. Reviewing the totality of the circumstances, the Court concludes that the evidence presented simply does not support a finding that the agents engaged in coercive conduct that rendered Defendant's statements involuntary.

■ Although the Defendant arrived in Virginia the night before his interrogation, after a long trip from Qatar spanning some seventy-seven (77) hours of travel and layovers, nothing indicates that he lacked the capacity to make voluntary statements. Moreover, there is no evidence to suggest that agents with the AFOSI used coercive techniques to impair his capacity. In fact, Special Agent Keith King ("Agent King") of the AFOSI testified at the suppression hearing that he took numerous steps to ensure that the Defendant's statements were voluntary. Agent King specifically requested that the Defendant not be required to arrive at the AFOSI offices before noon on the day following his return to the United States so that the Defendant could receive adequate rest. While we do not know the degree to which Defendant

may have rested or slept during his flights and layovers, we do know that nearly 12–hours passed between the time Defendant arrived at his home and the time he reported to his commander at Langley Air Force Base. Additionally, immediately upon meeting the Defendant, Agent King notified him of the allegations against him and of his constitutional right to remain silent and obtain an attorney. The Defendant nevertheless chose to discuss the matter. Moreover, Agent King testified that throughout the interview he repeatedly asked the Defendant if he was rested, feeling well, and if he needed anything to drink. At no point during the interview did the Defendant suggest that he could not continue, ask for the interrogation to stop, or appear as though he was tired. Finally, at the conclusion of the interrogation, Defendant wrote out in his own handwriting a statement in which he confessed that the allegations were true. At this point, Defendant was again reminded of his constitutional right to remain silent and to obtain an attorney. Defendant declined and signed his confession. This testimony adequately demonstrates that, viewing the circumstances in their totality, the Defendant's will was not overborne and his capacity for self determination was not impaired.

■ Equally without merit are Defendant's claims that agents used impermissible interrogation techniques to convince him to confess to the sexual assault. Defendant asserts that his statements were involuntary because agents told him to consider the impact a trial would have on Jane Doe, and because they suggested that Jane Doe might be able to more quickly obtain help if he confessed. There is no evidence to suggest that such techniques caused Defendant's will to be overborne. Moreover, interrogators merely provided truthful statements about the Defendant's

predicament. Finally, Defendant was advised on more than one occasion of his right to remain silent and his right to obtain an attorney. Defendant waived his rights and chose to confess to the allegations of sexual assault conveyed to authorities by Jane Doe. As a result, it cannot be said that the AFOSI agents coerced the Defendant into making statements involuntarily.

Accordingly, the Court finds that Defendant's statements were voluntary and, therefore, that the Defendant's suppression motion must be denied.

## IV. CONCLUSION

For the reasons provided above, the Court **DENIES** the Government's Motion to Preclude Defendant from Re-litigating his Motion to Suppress or in the Alternative use Transcript at Motion to Suppress. The Court also **DENIES** the Defendant's Motion to Dismiss for Lack of Venue; Motion to Dismiss for Lack of Jurisdiction; Motion to Dismiss for Violation of Military Statute of Limitations; and Motion to Suppress Statements.

The Clerk is **DIRECTED** to send a copy of this Order to the Defendant and to the Assistant United States Attorney.

**IT IS SO ORDERED.**